2022 IL App (1st) 182170

No. 1-18-2170

Opinion filed April 13, 2022

Third Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 3154 |
| | ) | |
| FRANCISCO LOZANO, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BURKE delivered the judgment of the court.
Justice Ellis specially concurred, with opinion.
Presiding Justice Gordon dissented, with opinion.

**OPINION**

¶ 1     Following a bench trial, defendant, Francisco Lozano, was found guilty of burglary and

possession of burglary tools and was sentenced to a total of three years' imprisonment. On appeal,

defendant argues that the trial court erred in denying his pretrial motion to suppress evidence that

officers recovered from him during a stop and frisk pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968),

and in denying his midtrial motion to suppress his statements to those officers, who questioned

him on scene without providing warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966).

Defendant also argues that the State failed to prove him guilty of both counts beyond a reasonable doubt. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3     Defendant was charged with one count of burglary (720 ILCS 5/19-1(a) (West 2018)), which alleged that he knowingly and without authority entered a 2005 Toyota Camry belonging to Jenelly Cherrez with intent to commit theft on February 20, 2018. The count of possession of burglary tools (*id.* § 19-2(a)) alleged that defendant knowingly possessed a screwdriver with intent to enter a motor vehicle and commit theft.

¶ 4                                 A. Suppression Hearing

¶ 5     Prior to trial, defendant filed a motion to suppress a car stereo, two screwdrivers, and a wallet that arresting officers recovered from his person. Defendant argued that the officers did not have reasonable suspicion to stop or frisk him under *Terry*.

¶ 6     At the suppression hearing, Chicago police officer Eulalio Rodriguez testified that he was on duty as a tactical officer on February 20, 2018. At 1:39 p.m., Rodriguez and his partner, Officer Jennifer Soto, were driving an unmarked police vehicle southbound on the 500 block of North Kedzie Avenue. Rodriguez saw defendant, whom he identified in court, running "at a fast rate of speed" toward Kedzie Avenue with his hands either inside or holding the front pocket of his sweatshirt. It was raining that day. Rodriguez made a U-turn and saw defendant run up a stairway and try to enter an abandoned apartment building. Rodriguez approached defendant and ordered him to stop; defendant stopped on the stairway. As Rodriguez approached defendant, he saw a "big bulge" in defendant's front sweatshirt pocket. Rodriguez stopped defendant "[t]o conduct a field

interview, ask him why he was running *** it was a street stop because he had a bulge and I was trying to see what was the bulge."

¶ 7 Rodriguez ordered defendant to remove his hands from the front pocket of his sweatshirt, but defendant "kept his right hand in his pocket." Rodriguez believed that defendant's pocket might contain a weapon, so he conducted a pat-down of the pocket and felt a "rectangular square box, which is a radio." He then reached into defendant's front sweatshirt pocket and recovered a car stereo, two screwdrivers, and a wallet. The officers asked defendant where he lived, and the address that he provided was not the address of the building he attempted to enter. Soto tried to enter the building but saw that there was no door handle. Rodriguez and Soto continued investigating and discovered "the ID for the victim." Defendant was eventually arrested.

¶ 8 The parties stipulated that Soto was on duty on the 500 block of North Kedzie Avenue at 1:39 p.m. on February 20, 2018. She was wearing a body camera that was functioning; she activated it, and it recorded video. The video truly and accurately depicts this incident. Defendant moved Soto's body camera video into evidence.

¶ 9 The video depicts Soto seated in the front passenger seat of a police vehicle. The sky is gray, the vehicle's windshield wipers are activated, and there are water droplets on the windshield. The vehicle makes a U-turn, drives for approximately 15 seconds, and stops. No Mars lights are visible, and no siren can be heard. Soto exits the front passenger side of the vehicle and walks around the rear. Defendant is wearing a blue hooded sweatshirt and standing alone on a stairway leading to a two-flat apartment building. A piece of plywood is where the building's front door would be, and an empty lot is to the left of the building. Defendant's back is toward the building, his right hand is raised, and his left hand appears to be in the front pocket of his sweatshirt.

Rodriguez approaches defendant; their lower bodies are partially obscured by a fence and a trash can.

¶ 10    Rodriguez puts his hand on defendant's upper back and escorts him toward the police vehicle as both officers order him to take his hand out of his pocket. A large bulge in defendant's front sweatshirt pocket is visible as he walks toward the police vehicle. Defendant supports the weight of the bulge with his right hand. Wires with a white plastic cap protrude from the bottom of defendant's sweatshirt. Defendant removes his left hand from his pocket, and the officers place both his hands on the hood of the police vehicle. The following exchange occurs:

> "RODRIGUEZ: Where you going? You just saw me, then you turned back.
>
> DEFENDANT: I'm going back in the house.
>
> RODRIGUEZ: OK, give me your f*** hands."

The officers handcuff defendant behind his back, and the exchange continues:

> "RODRIGUEZ: What you got on you?
>
> DEFENDANT: Nothing, sir.
>
> RODRIGUEZ: All right, so who lives right here at this house?
>
> DEFENDANT: My friend.
>
> RODRIGUEZ: What am I gonna find?"

¶ 11    Rodriguez reaches into defendant's front sweatshirt pocket and retrieves a brown wallet and a screwdriver. He then lifts the front of defendant's sweatshirt and recovers a black box with a screen. A small red cut is visible on the outer pinky side of defendant's left hand. Soto asks defendant why his hands are bleeding, but his response is inaudible. She also asks for his identification; he states that he does not have identification "right now." Defendant provides his

name, date of birth, and home address to Soto in response to her requests for that information.[1]

Soto uses the computer in the police vehicle, and the following exchange occurs:

"SOTO: This is some chick's stuff.

RODRIGUEZ: Yeah. He said he found it.

SOTO: Bulls***. He comes up revoked, he's on parole. I'm trying to see—ask him

if he ever lived on West Montano. West Montano.

RODRIGUEZ: Did you ever live on West Montano? He said no.

SOTO: I think he stole this from a car."[2]

¶ 12    Soto exits the vehicle and says, "He's clear, but he's on parole." Rodriguez is standing next

to defendant, who is still in handcuffs, at the front of the vehicle. The following exchange occurs:

"SOTO: Where'd you take the radio from?

DEFENDANT: I didn't take it; somebody just gave it to me."

Soto asks defendant who lives at the apartment building, but his response, if any, is inaudible. Soto

approaches the apartment building and knocks on a front window. No one responds. The plywood

in the doorframe has a round lock but a hole where the doorknob would be. Soto returns to the

police vehicle, and the video ends.

¶ 13    Defendant argued that Rodriguez did not have reasonable suspicion to stop him or probable

cause to search him because he did not flee from the officers, there were "a multitude of reasons

why he would be running," and "[i]t's not a crime to carry a bulky object on your person." The

---

[1]Defendant stopped playing the video for the trial court at this point. However, he moved the entire video into evidence, and the entire video is in the record on appeal.

[2]"Montano" is a phonetic approximation of the street name that Soto says.

State contended that the officers had "probable cause to stop" defendant because they saw him "running down an abandoned lot," he tried to enter an abandoned building when their vehicle made a U-turn in his direction, and he refused to remove his hand from his pocket.

¶ 14 The trial court denied defendant's motion to suppress. The court found Rodriguez credible and reasoned that defendant "attract[ed] his attention by running with some kind of big bulge" in his clothing, then running toward an abandoned building after the officers made a U-turn toward him. The court concluded that behavior, coupled with defendant's refusal to show his hands, justified Rodriguez's stop and search of defendant.

¶ 15 B. Trial

¶ 16 At trial, the State adopted the testimony from the suppression hearing, and Rodriguez testified consistently with his testimony at that hearing. He also testified that he asked defendant where he got the car stereo and that defendant stated that he got it at Ferdinand Street and Pulaski Road. Rodriguez also asked defendant where he got the wallet; defendant stated that he found it an alley. Defendant was handcuffed when Rodriguez questioned him, and Rodriguez did not advise defendant of his *Miranda* rights. During Rodriguez's testimony, defendant moved to suppress his on-scene statements about the radio and the wallet because he did not receive *Miranda* warnings. The court denied this motion, explaining that it was "not sure that *Miranda* attache[d]" when Rodriguez questioned defendant.

¶ 17 Rodriguez identified photographs of the stereo, the wallet, and the screwdrivers, and the State moved the photographs into evidence. The photographs depict two screwdrivers with black handles; the shafts of the screwdrivers are wrapped in brown paper. The wallet is brown with a zipper and the logo "Diesel." The stereo is a black box with a screen and the logo "Pioneer."

Rodriguez also identified an overhead map of the area, which the State moved into evidence. On the map, Rodriguez indicated that he stopped defendant on West Franklin Boulevard, just west of the intersection with Kedzie Avenue, seven to eight blocks east of Pulaski Road.

¶ 18   Officer Soto testified that she was on duty at approximately 1:30 p.m. on February 20, 2018, and was involved in the stop of defendant, whom she identified in court, on the 500 block of North Kedzie Avenue. After defendant was stopped, Rodriguez searched him and recovered a wallet. Soto looked through the wallet and found a student identification belonging to Jenelly Cherrez at George Westinghouse College Prep high school, near the location defendant was stopped. Soto went to the school and spoke with Cherrez.

¶ 19   Jenelly Cherrez testified that she attended George Westinghouse College Prep starting at 8 a.m. on February 20, 2018. She drove a gray 2005 Toyota Camry to school and parked it approximately half a block away from the intersection of Franklin Boulevard and North Kedzie Avenue at 7:45 a.m. Cherrez left her wallet and purse in the vehicle. Cherrez's father's friend owned the Camry at the time, but Cherrez and her parents later purchased it from him. Cherrez did not know defendant and did not give anyone permission to enter the Camry or possess her wallet or the car radio.

¶ 20   At approximately 2 p.m., Cherrez met with Soto, who showed her a wallet. Cherrez confirmed that the wallet was hers. She then led Soto to where the Camry was parked and saw that "the window was broken and the radio was out and the glove compartment where [her] wallet was open." Cherrez had left her wallet in the center console, which was open when she saw the vehicle in the afternoon. She had left her purse on the rear passenger seat that morning, but in the afternoon, she saw it on the floor in front of the passenger seat. Cherrez identified photographs of her wallet,

her car stereo, and the Camry as it appeared on the afternoon of February 20, 2018. The State moved these photographs into evidence. The photographs depict a gray sedan with its front passenger-side window covered by black plastic. Shattered glass is on the front passenger seat, and the center console is open. The vehicle's stereo is missing from the dashboard, and wires are visible where the stereo would be. A purse is on the front passenger-side floor of the vehicle.

¶ 21    In closing, the State argued that defendant was stopped within a block of where the Camry was parked and had the tools and the proceeds of the burglary on his person. Defendant contended that no witness saw him enter the Camry and that the items could have been taken from it at any point between 7:45 a.m. and 2 p.m. Defendant also argued that there were no fingerprints, DNA, or tool mark evidence connecting him to the Camry; thus, there was no evidence that he entered the vehicle or intended to do so.

¶ 22    The court found defendant guilty of both counts. The court reasoned that the officers found defendant with "co-mingled stolen property *** with screwdrivers *** that would have been necessary to complete this particular burglary, particularly the loosening of this radio and pulling it out of the car." The court also found that the "stories" defendant provided to the officers were "not reasonable."

¶ 23                    C. Posttrial and Sentencing

¶ 24    Defendant filed a motion for new trial, which argued in relevant part that the State failed to prove him guilty beyond a reasonable doubt. He also contended that the court erred in denying his pretrial motion to suppress evidence and his midtrial motion to suppress his statements. The court denied this motion.

¶ 25    The court sentenced defendant to three years' imprisonment on the burglary count and two years on the possession of burglary tools count, to run concurrently. Defendant filed a motion to reconsider sentence, which was denied.

¶ 26    Defendant timely appealed.

¶ 27                                    II. ANALYSIS

¶ 28    On appeal, defendant challenges the denial of his pretrial motion to suppress evidence, the denial of his midtrial motion to suppress statements, and the sufficiency of the evidence supporting his convictions.

¶ 29                           A. Motion to Suppress Evidence

¶ 30    Defendant first contends that the trial court should have granted his pretrial motion to suppress evidence because Rodriguez's *Terry* stop of him and the search that produced the car stereo, wallet, and screwdrivers were unlawful. At a hearing on a motion to suppress, the defendant has the burden to make a *prima facie* case that the evidence in question was obtained by an illegal search or seizure. *People v. Brooks*, 2017 IL 121413, ¶ 22. Thus, the defendant has primary responsibility for establishing the factual and legal bases for the motion to suppress. *Id.* If the defendant makes a *prima facie* case, the burden shifts to the State to present evidence to counter the defendant's *prima facie* case. *Id.* The ultimate burden of proof remains with the defendant. *Id.*

¶ 31    We review the denial of a motion to suppress using a two-part standard. *Id.* ¶ 21. We give great deference to the trial court's findings of fact, which we reverse only if they are against the manifest weight of the evidence. *Id.* However, we give less deference to factual findings based on video evidence because, unlike live witness testimony, a trial court does not occupy a position superior to the appellate court in evaluating video evidence. *People v. Shaw*, 2015 IL App (1st)

123157, ¶ 29. We review *de novo* whether police had reasonable suspicion to stop and frisk a defendant (*Brooks*, 2017 IL 121413, ¶ 21) and whether a defendant's statements should have been suppressed (*People v. Hunt*, 2012 IL 111089, ¶ 22). In reviewing the trial court's ruling on a motion to suppress evidence, we consider the evidence adduced at trial as well as at the suppression hearing. *People v. Hannah*, 2013 IL App (1st) 111660, ¶ 41.

¶ 32                                    1. *Terry* Stop

¶ 33    Defendant first argues that Rodriguez did not have reasonable suspicion to conduct a *Terry* stop of him. Both the United States Constitution and the Illinois Constitution prohibit unreasonable searches and seizures by police. See U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Reasonableness under the fourth amendment generally requires a warrant supported by probable cause. *People v. Thomas*, 198 Ill. 2d 103, 108 (2001). However, under *Terry*, a police officer may briefly detain a person for investigatory purposes if the officer reasonably suspects the person has committed or is about to commit a crime. *Id.* at 108-09; see also 725 ILCS 5/107-14(a) (West 2018) ("A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense ***."). Reasonable suspicion is based on the totality of the circumstances and commonsense judgments and inferences about human behavior. *People v. Timmsen*, 2016 IL 118181, ¶¶ 9, 13. Officers may rely on their training and experience and make inferences that would elude the untrained person. *People v. Leighty*, 362 Ill. App. 3d 258, 261 (2005). Reasonable suspicion is a "low bar." *People v. Patel*, 2020 IL App (4th) 190917, ¶ 25.

¶ 34 We find that Rodriguez had reasonable suspicion to conduct a *Terry* stop of defendant. Rodriguez saw defendant running on a rainy day in February, alone, with his hands either in or holding the front pocket of his sweatshirt. When Rodriguez made a U-turn and drove in defendant's direction, defendant ran toward what appeared to be an abandoned apartment building and tried to enter it. Soto's body camera recorded Rodriguez stating that defendant "saw [him], then [defendant] turned back," suggesting that defendant acted evasively upon seeing the officers. Defendant's actions qualified as "strange behavior," which supports a finding of reasonable suspicion sufficient to justify the initial *Terry* stop. See *People v. Sadeq*, 2018 IL App (4th) 160105, ¶ 84. At a minimum, Rodriguez could have suspected that defendant was attempting to break into an abandoned building. As Rodriguez approached defendant, he saw a bulge in the front pocket of defendant's sweatshirt. Soto's body camera video establishes that the bulge was noticeably larger and shaped differently than defendant's hands would be on their own, supporting an inference that one or more objects of considerable size were in his pocket. Altogether, it was reasonable for Rodriguez to find defendant's behavior suspicious and to stop him as he was trying to enter the abandoned building.

¶ 35 Defendant argues that Rodriguez lacked reasonable suspicion to stop him because "any innocent person could have been running with their hands in their pockets given the cold rain." However, the fact that defendant's behavior was not obviously illegal does not negate reasonable suspicion. See *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). When potentially innocent conduct can also suggest criminal activity, an investigative stop is justified to "resolve the ambiguity." *Id.* That is what happened here. Defendant's behavior, while *potentially* innocent and not obviously illegal, was also suspicious.

¶ 36    Defendant contends that the officers did not know that the building he attempted to enter was abandoned when they stopped him. Based on the body camera video, we believe that it was reasonable for the officers to think that the building that defendant tried to enter was abandoned. From a distance, the front doorway appears to be boarded up with a sheet of plywood. No one, aside from defendant, appears to be in or near the building. The windows are dark. The muddy, flooded front yard is empty except for a trash can and a rake. The adjoining empty lot contains garbage. These observations supported a suspicion that the building was abandoned and that defendant may have been trespassing by attempting to entering it. See 720 ILCS 5/21-3(a)(1) (West 2018).

¶ 37    Defendant also argues that "the body-cam video contradicts Rodriguez's rendition of the facts" because Rodriguez testified that defendant refused to take his right hand out of his pocket when Rodriguez stopped him, but the video shows defendant's right hand out of his pocket. That is true, but it is a minor discrepancy that does not change the reasonable suspicion analysis given for the totality of the circumstances. The video confirms that defendant kept one hand in his bulging sweatshirt pocket when Rodriguez approached him and did not remove it until he had been escorted to the police vehicle. In any event, as discussed below, this behavior is part of what justified Rodriguez's frisk of defendant, not what justified the initial *Terry* stop.

¶ 38    The cases that defendant cites are distinguishable and do not compel a finding that Rodriguez lacked reasonable suspicion to conduct a *Terry* stop of defendant. See, *e.g.*, *People v. White*, 2020 IL App (1st) 171814, ¶¶ 18-19 (no reasonable suspicion where the defendant may have yelled profanity and spat toward an officer); *People v. Williams*, 2016 IL App (1st) 132615, ¶ 47 (the defendant's "mere presence in the high-crime area, standing alone, was not sufficient" to

support reasonable suspicion); *In re Rafeal E.*, 2014 IL App (1st) 133027, ¶¶ 28-29 (the defendant walking away from a group of five or six individuals was not "evasive behavior"); *People v. Kipfer*, 356 Ill. App. 3d 132, 134 (2005) (the defendant walked away from a police vehicle in a parking lot); *People v. F.J.*, 315 Ill. App. 3d 1053, 1058-59 (2000) (officer saw the defendant standing at the entrance of an alley and put an unknown object in his pocket). Notably, none of these cases involved a suspect attempting to enter an abandoned building.

¶ 39    The dissent argues that Rodriguez testified to only two reasons for the *Terry* stop, namely that defendant was running and had a bulge in his pocket, and that these reasons do not support reasonable suspicion. Relatedly, the dissent contends that, because the officers did not explicitly cite defendant's attempt to enter the abandoned building as a reason for the stop during their suppression hearing testimony, that fact cannot support our finding of reasonable suspicion now. The dissent's view of the reasonable suspicion analysis is too narrow. First, we are not limited to the officers' subjective reasons for conducting a *Terry* stop. See *Village of Mundelein v. Marcis*, 348 Ill. App. 3d 1009, 1012 (2004). " '[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.' " *Whren v. United States*, 517 U.S. 806, 813 (1996) (quoting *Scott v. United States*, 436 U.S. 128, 136-38 (1978)).

¶ 40    Second, defendant did not contest that he tried to enter what appeared to be an abandoned apartment building. This occurred, as the dissent acknowledges, "[a]fter the officers made a U-turn" (*infra* ¶ 103) and before they conducted the *Terry* stop. These facts were personally observed by the officers, are in the record, and are not disputed by defendant. There is no indication that the

trial court found the officers' unrebutted testimony about their observations to be incredible. Just because the officers "fail[ed] to mention the suspicion of an immediate break-in as a reason for stopping defendant" (*infra* ¶ 104), that does not mean their observations of him just before the *Terry* stop are something we have "invent[ed]" (*infra* ¶ 109). We may affirm the denial of a motion to suppress on any basis in the record (*People v. Hood*, 2019 IL App (1st) 162194, ¶ 39), and the officers' observation of defendant's attempt to enter an abandoned building is in the record, and that attempt was suspicious and potentially illegal.

¶ 41    The dissent also contends that *Wardlow* is "as different from this case as a pea from an elephant." *Infra* ¶ 107. We do not analogize the facts of *Wardlow* to this case. Rather, we cite *Wardlow* for the general principle that a defendant's conduct may both justify a *Terry* stop and be "ambiguous and susceptible of an innocent explanation," as was the case in *Terry* itself. *Wardlow*, 528 U.S. at 125. Under *Terry*, officers can detain suspects to resolve that ambiguity. *Id.* The dissent does not appear to disagree with this general principle, which Illinois courts have repeatedly affirmed. See, *e.g.*, *People v. Neuberger*, 2011 IL App (2d) 100379, ¶ 8 ("That there were plausible innocent explanations for [the defendant's] conduct does not mean that it was unreasonable to subject him to the limited intrusion of a *Terry* stop to investigate those possibilities."); *People v. Ortiz*, 317 Ill. App. 3d 212, 223 (2000) ("Even when there may be an innocent explanation for each individual factor considered separately, the factors viewed in combination may constitute enough reasonable suspicion to warrant further detention.").

¶ 42    Finally, the dissent notes that "[t]he trial court found that the officer asked defendant to take his hands out of his pocket *before* the stop was effected, thereby using defendant's noncompliance to bolster suspicion for the stop." (Emphasis in original.) *Infra* ¶ 110. We do not

adopt the trial court's reasoning on this issue, and we do not use defendant's noncompliance as a basis for reasonable suspicion for the *Terry* stop. *Supra* ¶ 37 ("[T]his behavior is part of what justified Rodriguez's frisk of defendant, not what justified the initial *Terry* stop."). Accordingly, we find that the trial court correctly denied defendant's motion to suppress evidence to the extent that it was premised on the lack of reasonable suspicion for the *Terry* stop.

¶ 43                                    2. *Terry* Frisk

¶ 44    Defendant next argues that, even if Rodriguez had reasonable suspicion to stop him, "the subsequent search exceeded any frisk within the bounds of *Terry*" because Rodriguez immediately led defendant to a police vehicle, handcuffed him, and searched inside his sweatshirt.

¶ 45    If a *Terry* stop is lawful, an officer may frisk the person stopped if the officer reasonably suspects that the person is armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009); see also 725 ILCS 5/108-1.01 (West 2018) ("When a peace officer has stopped a person for temporary questioning pursuant to Section 107-14 of this Code and reasonably suspects that he or another is in danger of attack, he may search the person for weapons."). A frisk is "a limited protective search *** of the individual's outer clothing." *People v. Johnson*, 387 Ill. App. 3d 780, 788 (2009). The purpose of a frisk is to protect the officer's safety and the safety of others in the area, not to gather evidence of a crime. *Id.* Thus, the frisk must be limited to actions that are reasonably likely to discover weapons that could be used to harm the officer. *People v. Moss*, 217 Ill. 2d 511, 533 (2005). If a frisk exceeds that scope, it is no longer lawful, and anything recovered beyond that point must be suppressed. *Johnson*, 387 Ill. App. 3d at 788.

¶ 46    Rodriguez testified that he conducted a pat-down of defendant's sweatshirt pocket because he believed defendant's pocket might contain a weapon. This was a *Terry* frisk. See *id.* Soto's

body camera video shows an obvious bulge in defendant's sweatshirt pocket, and it shows that defendant kept his left hand inside his pocket until Rodriguez brought him to the police vehicle. Rodriguez's *Terry* frisk was justified to determine whether defendant was holding a weapon in his sweatshirt pocket. See *People v. Crowder*, 2018 IL App (1st) 161226, ¶ 31 (an officer's observation of a bulge under a suspect's shirt "can give rise to the inference that [the suspect] is armed and presents an immediate danger"); *People v. Richardson*, 2017 IL App (1st) 130203-B, ¶ 23 (an officer " 'need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.' " (quoting *Terry*, 392 U.S. at 27)). Soto's body camera video does not establish when this frisk occurred, but Rodriguez testified that it occurred before he reached into defendant's sweatshirt pocket.

¶ 47    When Rodriguez frisked defendant's pocket, he felt a hard rectangular object. Officers must have "leeway *** upon the feeling of a hard object of substantial size, the precise shape or nature of which is not discernible through outer clothing." (Internal quotation marks omitted.) *People v. Day*, 202 Ill. App. 3d 536, 544 (1990). It was reasonable for Rodriguez to determine whether the hard object creating a bulge in defendant's front pocket was a weapon by removing it to examine it. When a frisk reveals "hard, sizeable objects" and "[t]hese objects could be fairly viewed as instruments capable of being used as weapons," under *Terry*, an officer is "justified in investigating the exact nature of these objects" by "reaching within [the suspect's] outer clothing to secure the objects." *People v. Lee*, 48 Ill. 2d 272, 278 (1971). The alternatives—leaving the hard object in defendant's pocket or allowing him to remove it on his own—would have been unreasonable and unsafe. The record contains no evidence that Rodriguez's purpose was to search

for anything other than weapons. See *Moss*, 217 Ill. 2d at 534. Thus, it was reasonable and lawful for Rodriguez to reach into defendant's pocket to recover any potential weapons.

¶ 48    The body camera video establishes that Rodriguez recovered a screwdriver from defendant's sweatshirt pocket. Rodriguez was justified in doing so because the screwdriver could have been used as a weapon. Illinois courts "have frequently noted that objects which are not *per se* deadly weapons may be used in such a manner as to become deadly weapons" (*Day*, 202 Ill. App. 3d at 543-44), including screwdrivers (see, *e.g.*, *People v. Flores*, 371 Ill. App. 3d 212, 220 (2007)).

¶ 49    In addition, Rodriguez was justified in removing the car stereo from underneath defendant's sweatshirt because he had probable cause to believe that it was contraband. See *People v. DeLuna*, 334 Ill. App. 3d 1, 13 (2002) ("[i]f an officer, while conducting a lawful pat-down search, feels an object that he believes is not a weapon but whose shape or weight makes its identity apparent, he may seize it if he has probable cause to believe that the object is contraband"). A detached car stereo under defendant's sweatshirt with dangling wires, coupled with the screwdrivers, supported a reasonable belief that the radio was evidence of a vehicular burglary. See *Flores*, 371 Ill. App. 3d at 223-25 (the defendant's possession of car "stereos with loose wiring harnesses" and a "screwdriver (which is a tool used for car stereo theft)" supported probable cause to believe that the defendant "had been involved in car-stereo thefts"). Thus, Rodriguez's frisk of defendant and recovery of the items from his person did not violate the fourth amendment.

¶ 50    Defendant essentially argues that Rodriguez conducted a custodial search that needed to be supported by probable cause, not a *Terry* frisk justified by reasonable suspicion, because he immediately reached into defendant's pocket and under his sweatshirt and removed the items that

he found. We disagree. First, the fact that defendant was handcuffed did not automatically transform this *Terry* stop into an arrest and a search incident to arrest that had to be supported by probable cause. See, *e.g.*, *People v. Thornton*, 2020 IL App (1st) 170753, ¶ 36 ("The mere restraint of an individual or act of handcuffing does not transform an investigatory *Terry* stop into an illegal arrest."). As with all fourth amendment issues, the issue is reasonableness. *People v. Daniel*, 2013 IL App (1st) 111876, ¶ 40 ("When arrest-like measures such as handcuffing are employed [during a *Terry* stop], they must be reasonable in light of the circumstances that prompted the stop or that developed during its course." (Internal quotations omitted.)). Handcuffing defendant after he was reluctant to remove his hand from his front pocket was reasonable so the officers could safely investigate him and what he was doing. It should be noted that only Rodriguez was available to guard defendant while Soto researched his background and examined the building that defendant tried to enter.

¶ 51    This is not like the cases that defendant cites in which an officer reached into a suspect's pocket after the officer affirmatively determined that it did not contain a weapon. See, *e.g.*, *Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993) (officer recognized an object in the defendant's pocket as a bag of crack cocaine and never thought it was a weapon); *White*, 2020 IL App (1st) 171814, ¶ 26 (officer felt a plastic pill bottle in the defendant's pocket). Rather, Rodriguez felt a hard object when he frisked defendant's sweatshirt pocket and then properly removed the object to determine whether it was a weapon. He also properly removed suspected contraband from defendant's sweatshirt. Accordingly, we find that the trial court did not err in denying's defendant's motion to suppress evidence to the extent that it was premised on an unlawful frisk or search.

¶ 52                              B. Motion to Suppress Statements

¶ 53    Defendant next argues that the trial court erred in denying his midtrial motion to suppress his statements regarding the car stereo and wallet because Rodriguez obtained those statements in violation of *Miranda*.

¶ 54    The State maintains that defendant forfeited this issue by raising it for the first time during trial, which is generally improper. We agree. See *People v. Causey*, 341 Ill. App. 3d 759, 766 (2003) (a motion to suppress statements shall be made before trial unless an exception applies).

¶ 55    Defendant argues that "it was not clear until trial that the officers interrogated [him] in such a way that required *Miranda* warnings" and, therefore, an exception to the forfeiture rule applies. See 725 ILCS 5/114-11(g) (West 2018) (a motion to suppress statements "shall be made before trial unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion"). Defendant does not explain why it was "not clear until trial" that the officers questioned him without providing his *Miranda* rights. On the contrary, defendant himself was aware that the officers questioned him on scene without providing *Miranda* warnings. Moreover, defendant received the video recording from Soto's body camera in discovery and introduced it at the suppression hearing. This body camera footage depicts the officers questioning defendant without providing *Miranda* warnings, as well as defendant's responses. Thus, the grounds for a motion to suppress statements were apparent prior to trial.

¶ 56    The dissent argues that the State failed to object to defendant's motion to suppress statements, the trial court properly exercised its discretion in considering the motion, and the State failed "to prove the error harmless beyond a reasonable doubt." *Infra* ¶ 127. However, the dissent does not explain why the general rule that a motion to suppress must be made before trial does not

apply in this case. Even *People v. Humphries*, 223 Ill. App. 3d 81 (1991), which the dissent cites, recognized that section 114-11 of the Code of Criminal Procedure of 1963 "was enacted by the Illinois legislature to allow for midtrial motions to suppress *in limited circumstances*." (Emphasis added.) *Id.* at 87. As explained above, defendant was aware of the grounds for a motion to suppress statements before trial but did not file one. We cannot see why an exception to the general rule requiring pretrial filing should apply here.

¶ 57     The trial court cited two grounds for denying defendant's motion to suppress statements: (1) that "[i]t's a pretrial motion" and the court was "in the middle of trial" and (2) that the court was "not sure that *Miranda* attache[d] at that point." We agree with both. Defendant's motion to suppress statements was untimely, and to the extent that the court could exercise its discretion to consider the untimely motion, *Miranda* did not apply to the situation at issue. We do not, as the dissent claims, find that the trial court abused its discretion. *Infra* ¶ 127. On the contrary, we affirm the trial court's judgments. Accordingly, defendant forfeited this issue by not properly raising it in the trial court.

¶ 58     Nevertheless, defendant requests that we review the denial of his motion to suppress statements for plain error. Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." "A defendant seeking plain-error review has the burden of persuasion to show the underlying forfeiture should be excused." *People v. Johnson*, 238 Ill. 2d 478, 485 (2010). The plain error doctrine applies when a clear or obvious error occurred and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant or (2) the error is so serious that it affected the fairness of the defendant's trial and

challenged the integrity of the judicial process. *People v. Clark*, 2016 IL 118845, ¶ 42. We review claims of plain error *de novo*. *Johnson*, 238 Ill. 2d at 485. The first step in plain error analysis is to determine whether a clear or obvious error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 59　　The fifth amendment to the United States Constitution, which applies to the states under the fourteenth amendment, provides that " '[n]o person *** shall be compelled in any criminal case to be a witness against himself.' " *Hunt*, 2012 IL 111089, ¶ 23 (quoting U.S. Const., amend. V). *Miranda* requires police officers to warn a suspect before a custodial interrogation that (1) he has the right to remain silent, (2) anything he says can be used against him in a court of law, (3) he has the right to have an attorney present, and (4) if he cannot afford an attorney, one will be appointed for him before questioning. *Miranda*, 384 U.S. at 479. The *Miranda* Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. The central principle of *Miranda* is that, "if the police take a suspect into custody and then ask him questions without informing him of the rights enumerated above, his responses cannot be introduced into evidence to establish his guilt." *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984). However, during a *Terry* stop, an "officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* at 439. Thus, the United States Supreme Court has not held that all *Terry* stops are subject to the dictates of *Miranda*. *Id.* at 439-40. The *Miranda* Court itself cautioned that " '[g]eneral on-the-scene questioning as to facts surrounding a crime *** is not affected by our holding.' " *People v. Jeffers*, 365 Ill. App. 3d 422, 428 (2006) (quoting *Miranda*, 384 U.S. at 477).

¶ 60    We are not persuaded that defendant was in custody for the purposes of *Miranda* when Rodriguez questioned him about the car stereo and wallet. Although defendant had been detained and handcuffed pursuant to a *Terry* stop and was not free to leave, that is not dispositive of whether he was in custody. See *id.* at 429. Defendant had not been told that he was under arrest, and the officers had not used any weapons to detain him. Only two officers were present. The questioning occurred on a public street, not in a coercive environment such as a police station. See *People v. Briseno*, 343 Ill. App. 3d 953, 958 (2003) (finding that the defendant was not in custody under *Miranda* when he was stopped on a "major thoroughfare" and only two officers were in his "immediate presence").

¶ 61    The body camera video indicates that Rodriguez asked defendant where he got the wallet and defendant responded that he found it, within four minutes of the initial *Terry* stop on the stairway. Soto asked defendant where he got the stereo within six minutes of the *Terry* stop. The time and length of questioning are relevant to determining whether defendant was in custody for purposes of *Miranda*. See *People v. Slater*, 228 Ill. 2d 137, 150 (2008). The span of only four to six minutes between the *Terry* stop and the question at issue indicates that the officers' on-scene questioning of defendant was part of a noncustodial *Terry* stop to which *Miranda* did not apply, even though some of those questions concerned the suspected burglary. "*Miranda* is not triggered, and the admonishments are not required, when police conduct general investigatory on the scene questioning as to the facts surrounding a crime or other general questioning." *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 35. That is what the officers did in this case. They investigated, by asking questions, where defendant was going, whether he lived or knew anyone at the building that he tried to enter, how his hand was injured, and where he obtained two items—a wallet and a

detached car stereo—that did not appear to belong to him. While some indicia of a formal arrest were present, namely handcuffs, the evidence reflects that the officers were gathering information when they questioned defendant and had not yet decided to arrest him.

¶ 62    Moreover, holding that the officers were required to give *Miranda* warnings in this case would suggest that officers must give *Miranda* warnings within the first few minutes of a *Terry* stop, before they conduct any meaningful investigation. Such a holding would undermine *Terry* itself, which recognized "that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior." *Terry*, 392 U.S. at 22. To this end, *Terry* allows officers to "ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions" without triggering *Miranda*. *Berkemer*, 468 U.S. at 439; see also *People v. Lee*, 214 Ill. 2d 476, 487 (2005) (*Terry* allows "temporary questioning"). To the extent that defendant seeks a time limit for officers to provide *Miranda* warnings during a *Terry* stop, we decline to set one.

¶ 63    The dissent argues that the officers had to provide *Miranda* warnings because a reasonable person in defendant's position would believe that he was being arrested "[a]fter being pulled, yelled at, handcuffed, and searched to reveal a car radio with dangling wires and screw drivers, and asked processing questions." *Infra* ¶ 125. However, the two most obvious indicia of "formal arrest" (see *Slater*, 228 Ill. 2d at 150)—being placed in a police vehicle and transported to a police station for booking—had not occurred when the officers questioned defendant. We believe that, at the time the officers questioned defendant, a reasonable person would believe that the officers were still investigating and deciding whether to formally arrest him. We do not suggest that being

placed in a police vehicle or being transported to a station are *necessary* for custody under *Miranda*. But this case illustrates a situation in which a defendant is not free to leave under the fourth amendment yet is not in custody for purposes of *Miranda* and the fifth amendment. We do not cite *Jeffers* because it is factually similar to this case but because it recognizes that cases can fall into an area between a fourth amendment seizure and fifth amendment custody. *Jeffers*, 365 Ill. App. 3d at 429. The United States Supreme Court and other Illinois courts recognize this principle as well. See, *e.g.*, *Berkemer*, 468 U.S. at 439-40; *People v. Havlin*, 409 Ill. App. 3d 427, 434 (2011). Accordingly, the trial court did not make a clear or obvious error in determining that *Miranda* did not apply to this situation, and plain error review is not warranted.

¶ 64          C. Sufficiency of the Evidence

¶ 65     Finally, defendant argues that the State failed to prove him guilty beyond a reasonable doubt of burglary and possession of burglary tools. Upon a challenge to the sufficiency of the evidence, we review "whether, viewing the evidence in the light most favorable to the State, ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The trier of fact resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from the evidence. *People v. Brown*, 2013 IL 114196, ¶ 48. On appeal, we make all reasonable inferences from the record in favor of the State (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)), and we will not reverse a conviction unless the evidence is " 'unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt' " (*People v. Jackson*, 232 Ill. 2d 246, 281 (2009)).

¶ 66    To prove defendant guilty of burglary, the State had to establish that he knowingly and without authority entered Cherrez's vehicle with the intent to commit a theft therein. See 720 ILCS 5/19-1(a) (West 2018). The trier of fact may presume a defendant's guilt of burglary based on his exclusive possession of recently stolen property if (1) there is a rational connection between the defendant's recent possession of stolen property and his participation in the burglary; (2) the defendant's guilt of the burglary "more likely than not" flowed from his recent, unexplained, and exclusive possession of the proceeds; and (3) there was corroborating evidence of the defendant's guilt. *People v. Natal*, 368 Ill. App. 3d 262, 268 (2006). To prove defendant guilty of possession of burglary tools, the State had to establish that he knowingly possessed tools suitable for breaking into Cherrez's vehicle with the intent of committing a theft within. See 720 ILCS 5/19-2(a) (West 2018).

¶ 67    We find that the evidence sufficiently supported defendant's burglary conviction. First, there was a rational connection between the burglary and defendant's possession of Cherrez's wallet and the car stereo. Cherrez's testimony established that both items were taken from the Camry without her permission on February 20, 2018. Defendant's possession of them on the same day, within a block of where the Camry was parked, supported an inference that he took them from the Camry. Second, defendant's guilt of the burglary flowed naturally from his possession of the stolen items. The officers saw defendant running near the location of the burglary with screwdrivers that he likely used to remove the car stereo. As the officers drove toward defendant, he attempted to flee into an abandoned building where he did not live. Flight is evidence of consciousness of guilt and, together with other factors, may support a finding of criminal activity. *People v. Aljohani*, 2021 IL App (1st) 190692, ¶ 64. Finally, the fresh injury to defendant's hand

and the smashed window of the Camry corroborated his involvement, as they suggested that he broke the window to get into the Camry. Thus, the evidence was sufficient to find defendant guilty of burglary.

¶ 68    Similarly, the evidence was sufficient for the trial court to find defendant guilty of possession of burglary tools, namely, the two screwdrivers. Screwdrivers are tools known to be used for car stereo theft. See *Flores*, 371 Ill. App. 3d at 223. The evidence in this case supported a straightforward, rational series of events. Defendant smashed the passenger-side window of the Camry and injured his hand doing so. He used the screwdrivers to pry out the car stereo and took Cherrez's wallet from the center console, which he left open. He then ran away from the scene of the burglary, and the officers stopped him approximately a block away and found both the tools and the proceeds of the recent burglary in his possession. Thus, the evidence sufficiently supported both of defendant's convictions.

¶ 69    Defendant contends that the State failed to prove his guilt because (1) more than six hours passed between the time Cherrez parked her Camry and the time defendant was arrested, (2) no eyewitnesses or physical evidence linked defendant to the Camry, and (3) defendant's statements to the officers "provided reasonable explanations as to why he was in possession of Cherrez's car radio and wallet." None of these arguments compel reversal.

¶ 70    First, the gap in time between Cherrez parking the Camry and defendant burglarizing it did not negate the other evidence connecting him to the burglary. On the contrary, as explained above, the evidence supported a reasonable inference that the officers found defendant shortly after he committed the burglary. Second, to the extent that defendant complains about a lack of DNA or fingerprint evidence linking him to the Camry, the absence of such evidence does not contradict

the other evidence linking defendant to the burglary. See *People v. Carini*, 254 Ill. App. 3d 1, 12 (1993). Furthermore, the State may prove its case by circumstantial evidence, as it did here. See *People v. Campbell*, 146 Ill. 2d 363, 379 (1992). Finally, it is difficult to accept defendant's argument that his statements regarding the wallet and the car stereo undermined the State's proof of his guilt, given that defendant moved to suppress them during trial and now argues that their admission was prejudicial to him. Accordingly, we affirm defendant's convictions for burglary and possession of burglary tools.

¶ 71                                   III. CONCLUSION

¶ 72    For the foregoing reasons, we affirm defendant's convictions.

¶ 73    Affirmed.

¶ 74    JUSTICE ELLIS, specially concurring:

¶ 75    I concur in the judgment for the reasons stated herein. I find the *Terry* question very close but ultimately agree that the record supports the validity of the *Terry* stop. I agree with the dissent that the officers violated *Miranda* when they questioned defendant and that it was error to introduce that testimony, but I would find that error harmless beyond a reasonable doubt under the circumstances.

¶ 76    I fully agree with the dissent that running across a street—particularly on a cold, rainy day—with a bulge in one's pocket is not, alone, sufficient to support a *Terry* stop. But the record shows more than those facts. The record also shows that defendant changed direction upon seeing the police officers.

¶ 77    The trial court found reasonable suspicion based on those facts—that defendant "attracts [the officer's] attention" by "running with some big bulge in his pants," and that when the officers

turned the car around, defendant "runs toward an abandoned building trying to get further away from the officers."

¶ 78    Those findings are not against the manifest weight of the evidence. For one, the video shows clearly that the bulge in the front pouch of defendant's sweat jacket was considerable. And the video shows that, after Officer Rodriguez apprehended defendant on the stairs of the abandoned apartment building, the following exchange occurred between the officer and defendant:

> "RODRIGUEZ: Where are you going? 'Cause you saw us and turned back.
>
> DEFENDANT: I was going back in the house."

¶ 79    It is a more than reasonable inference from this exchange that the officer was asking defendant why he changed direction—why he "turned back"—upon seeing the officers. Clearly, defendant thought so because his response was that he was "going back in the house." But regardless of what defendant thought, the most reasonable interpretation of the officer's question, in context, was that defendant was running in one direction across the street and then, upon seeing the police officers, turned backward and ran in basically the opposite direction, away from the police.

¶ 80    Avoiding a police officer, alone, will not provide a reasonable suspicion to support a *Terry* stop, as there are "undoubtedly" noncriminal reasons for avoiding law enforcement. *Wardlow*, 528 U.S. at 125; see *People v. Jenkins*, 2021 IL App (1st) 200458, ¶ 45; *People v. Bloxton*, 2020 IL App (1st) 181216, ¶ 21; *In re D.L.*, 2018 IL App (1st) 171764, ¶ 29.

¶ 81    But taking steps to evade the police is certainly one factor to be considered, along with others, to support reasonable suspicion. *Wardlow*, 528 U.S. at 124-25; *Jenkins*, 2021 IL App (1st) 200458, ¶¶ 45-46. The fact that defendant, carrying a sizeable bulge in the front pouch of his sweat

jacket, "turned back" upon seeing the police, toward the building where he was ultimately caught, was minimally sufficient to support a reasonable, articulable suspicion to justify a *Terry* inquiry.

¶ 82    The dissent believes that the exchange between officer and defendant quoted above was referring to defendant "turning back" at the top of the stairs after the officer, at the bottom of the stairs, ordered him to stop. To that, I would respectfully make two observations.

¶ 83    First, if there is more than one reasonable inference to be drawn from the evidence, and we are reviewing a trial court's factual findings under a deferential manifest-weight standard, we cannot say that the trial court manifestly erred in choosing one reasonable inference over another. *People v. Dunmire*, 2019 IL App (4th) 190316, ¶ 35 (manifest-weight review of suppression ruling means we will reverse if " 'the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented' " (quoting *People v. Peterson*, 2017 IL 120331, ¶ 39)).

¶ 84    Second and more to the point, I must respectfully disagree with my dissenting colleague that his interpretation of this exchange is reasonable. In the dissent's mind, when the officer asked defendant why he "turned back" when he saw the police, what the officer meant was, why did he turn back at the top of the stairs—instead of entering the house—when Officer Rodriguez ordered him to stop. I cannot imagine why the first question out of the visibly angry officer's mouth would be asking a suspect why he *complied* with the officer's command, instead of fleeing into the house. Defendant did what the officer ordered him to do; asking defendant why he complied would be an odd question to ask, much less the first thing an officer would ask.

¶ 85    It is far more likely that the officer was asking defendant, in effect, why he ran from the police upon seeing them—exactly the type of question one would expect an officer to ask during a *Terry* stop to confirm or dispel the officer's suspicion of criminal activity.

¶ 86    So while I am sympathetic to much of what the dissent argues and consider this question to be close, I concur with the lead opinion that the record is minimally sufficient to support the *Terry* stop here.

¶ 87    I agree with the dissent and depart from the lead opinion, however, on the *Miranda* question. Initially, I agree with the dissent that we should not find this issue forfeited, for the reasons the dissent gives: the trial court considered it on the merits, and thus we should *review* it on the merits.

¶ 88    On those merits, I agree with the dissent that, when defendant was questioned about the car stereo and woman's wallet while being handcuffed, he was subjected to a custodial interrogation that triggered *Miranda* warnings.

¶ 89    First, the questions put to defendant about how he came to be in possession of the car stereo and wallet obviously constituted an interrogation—questions reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *People v. Olivera*, 164 Ill. 2d 382, 391 (1995). Indeed, most *Terry* inquiries involve interrogations; that is their very purpose, to confirm or dispel whether the suspect is engaged in criminal activity.

¶ 90    But not all *Terry* stops require *Miranda* warnings, of course, because the individual being questioned is not always in "custody." In the context of traffic or street stops, the question of "custody" is whether the individual being detained is "subjected to restraints comparable to those associated with a formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984).

¶ 91    The lead opinion correctly notes that the use of handcuffs to restrain a subject does not automatically mean that the subject is in "custody." See *People v. Colyar*, 2013 IL 111835, ¶ 46 ("handcuffing does not automatically transform a *Terry* stop into an illegal arrest"); *Jenkins*, 2021 IL App (1st) 200458, ¶ 65. For example, an officer may need to handcuff detainees while searching a vehicle to conduct the *Terry* search itself, and it would be dangerous for officers to turn their backs on multiple individuals while conducting that search, particularly when the detainees outnumber the officers. See *Colyar*, 2013 IL 111835, ¶ 47. At that point, there is no basis to arrest those individuals; the search has not yet even taken place; the handcuffing is purely for officer safety.

¶ 92    But that does not describe this case. After finding defendant in possession of a car stereo with the wires still protruding, along with tools commonly associated with burglary and a woman's wallet, the officers had ample reason to believe that defendant had committed the crime of theft or burglary when they handcuffed defendant. They then proceeded to hold him, handcuffed, for over five minutes while one of the officers ran a search of defendant inside the car. The time of the handcuffing alone is not dispositive, of course, but the entire episode had moved far beyond a mere *Terry* stop by the time the officers questioned him substantively.

¶ 93    That is not to say that the officers had no right to handcuff defendant—perhaps they did— only that having done so, under these circumstances, their treatment of defendant was comparable to a formal arrest, and they were thus required to give defendant *Miranda* warnings before engaging in substantive questioning. The admission of defendant's statements to the police in violation of *Miranda* was error.

¶ 94    But the admission of a defendant's statements in violation of *Miranda* does not warrant reversal of the underlying conviction if the State can demonstrate that the error was harmless beyond a reasonable doubt. *People v. R.C.*, 108 Ill. 2d 349, 355 (1985); see *In re D.L.H.*, 2015 IL 117341, ¶¶ 56, 58, 81 (admission of involuntary statement to police is subject to harmless-error analysis). Of course, the "use of a defendant's *physically* coerced confession as substantive evidence of his guilt is never harmless error." (Emphasis in original.) *People v. Wrice*, 2012 IL 111860, ¶ 71. But there is no claim here of physical coercion, so the harmless-error analysis for constitutional errors, such as *Miranda* violations, is appropriate.

¶ 95    Here, any error in introducing evidence of the defendant's response to the improper custodial interrogation was harmless beyond a reasonable doubt. This is not a case where the defendant confessed to the crime in response to the improper custodial interrogation. That would make this case more difficult, as " 'a confession is the most powerful piece of evidence the State can offer, and its effect on a jury is incalculable.' " *People v. Simpson*, 2015 IL 116512, ¶ 36 (quoting *R.C.*, 108 Ill. 2d at 356).

¶ 96    Defendant did not admit to any crime in response to the improper custodial interrogation. He merely gave an alternative explanation for how he came into possession of the car stereo and the victim's wallet. True, the court found that explanation lacking in credibility, and that did not help matters for defendant, but the evidence of his guilt was airtight, as explained in the lead opinion. Whether the trial court did or did not hear defendant's incredible explanation would not possibly have impacted the verdict. The error was thus harmless beyond a reasonable doubt. I concur in the judgment.

¶ 97    PRESIDING JUSTICE GORDON, dissenting:

¶ 98    Our courts are required to decide cases based on the evidence presented and the existing law, even when a defendant is a thief. In the case at bar, the police officers lacked reasonable suspicion to make a stop after viewing a man running in the rain on a February day in Chicago, with a bulge in the pocket of his sweatshirt. As a result, I must respectfully dissent.

¶ 99    In the case at bar, we do not have to guess why the officer, who effected the stop, believed that he had a reasonable, articulable suspicion justifying a stop. At the suppression hearing, he was specifically asked "[w]hy were you trying to stop" defendant. The officer testified that he effected the stop of defendant for two reasons. The officer observed (1) defendant running (2) with a bulge in his pocket. When asked for the reason for the "street stop," the officer testified that he wanted to know "why he was running" and "to see what was the bulge." Neither the officer nor his partner testified, either at the suppression hearing or the trial, that defendant changed direction upon observing the police. Video footage establishes that, immediately after defendant ascended the stoop of an abandoned building and turned back toward the approaching officer, the officer observed, "[y]ou just saw me and you turned back." The record establishes that the officer stopped defendant solely based on the fact that he was running in the rain on a February day with a bulge in his pocket.

¶ 100   We do not have to guess at precisely which moment the stop occurred, because the officer testified to that also. The officer testified that, when he approached defendant on foot, defendant was not free to leave. After the officer stopped defendant, the officer, who was physically much larger than defendant, immediately grabbed defendant by the back of his sweatshirt, while simultaneously yelling "show me your f*** hands" and pulling defendant toward the police vehicle, where defendant was shoved against the back hood of the police vehicle, handcuffed,

searched, interrogated, and asked processing questions, such as his full name, date of birth, and address.

¶ 101    The record before us establishes that, prior to the stop, defendant was running in a cold rain, with his hands in his sweatshirt's front pocket. He did not start running when he observed the officers; rather, they observed him when he was *already* running.

¶ 102    After observing defendant already running, the officers made a U-turn in an unmarked vehicle. They did not testify that there was anything about their vehicle to indicate that they were, in fact, police officers. A video clip of the incident, introduced as an exhibit at the suppression hearing, does not show that the police activated either their siren or Mars lights prior to the stop.[3]

¶ 103    After the officers made a U-turn, they observed defendant trying to seek shelter in an abandoned building.

¶ 104    The lead opinion finds, without any support from the evidence, that the officers "could have" suspected that defendant was attempting "to break into" the abandoned building and cites in support the statutory section governing the offense of criminal trespass. *Supra* ¶¶ 34, 36 (citing 720 ILCS 5/21-3(a)(1) (West 2018)). But the officers never testified to that. Not only did the officers fail to mention the suspicion of an immediate break-in as a reason for stopping defendant, but the cited section specifically exempts from prosecution anyone who enters an abandoned building and then cleans up litter there or repairs it. 720 ILCS 5/21-3(d) (West 2018). And, in fact,

---

[3]The State concedes in its brief to this court that the officers did not activate either a siren or Mars lights prior to their stop of defendant.

defendant made absolutely no attempt to break and enter, and the officers on the scene did not mention that as a reason for their suspicion.[4] That came without any support from the evidence.

¶ 105   The lead opinion writes that "the dissent contends that, because the officers did not explicitly cite defendant's attempt to enter the abandoned building as a reason for the stop," it "cannot support our finding of reasonable suspicion." *Supra* ¶ 39. To be clear, defendant made no attempt whatsoever to break into the building and turned away from the closed door. This does not support a reasonable suspicion of any criminal activity.

¶ 106   The lead opinion cites the United States Supreme Court case of *Whren* for the proposition that an officer's stated reason for a stop does not matter. *Supra* ¶ 39. In *Whren*, the defendant argued that, even though the officer's given reason for a stop was a traffic violation, the stop was actually a pretext to search for drugs. *Whren*, 517 U.S. at 809-10. The *Whren* Court found that an "ulterior motive[ ]" will not invalidate the officer's given reason, so long as the given reason is valid. *Whren*, 517 U.S. at 811. In other words, the officer's given reason is what matters.

¶ 107   The lead opinion concedes that "defendant's behavior" was "*potentially* innocent" and "not obviously illegal" and cites in support *Wardlow* for nonetheless finding a reasonable suspicion. (Emphasis added.) *Supra* ¶ 35 (citing *Wardlow*, 528 U.S. at 125). *Wardlow* is as different from this case as a pea from an elephant. In *Wardlow*, the United States Supreme Court found the officers had a reasonable suspicion where the officers testified (1) that the defendant was in a high crime neighborhood "known for heavy narcotics trafficking" and (2) that the defendant started

---

[4]This court has found that, "in committing a criminal trespass to property, the fundamental criminal act is the actual unlawful entry on the property *of another*." (Emphasis added.) *People v. Likar*, 329 Ill. App. 3d 654, 661 (2002). Thus, every fact that the lead opinion cites as evidence of the building's abandonment (*supra* ¶¶ 9, 12, 34, 38) is a reason why this was likely *not* criminal trespass and also may be why the officers never voiced it as a basis for their suspicion.

running immediately upon noticing "a four-car caravan" of police vehicles suddenly enter the area. *Wardlow*, 528 U.S. at 124-25. By contrast, in the case at bar, (1) there was no testimony at all that this was a high crime area, and (2) defendant was already running when the police first observed him, and there is no evidence whatsoever that he was running because he observed the police. In fact, the evidence shows that the vehicle that the police were driving was not a marked police vehicle.

¶ 108　In *Wardlow*, when the officers first observed the defendant, he was standing still; it was when he looked at them that he suddenly decided to run. *Wardlow*, 528 U.S. at 122. By contrast, defendant did not *start* running *upon* noticing a police presence; rather, the police first observed him as he was running. *Wardlow* undercuts the lead opinion's finding rather than supporting it.

¶ 109　Not only did the officers fail to testify that they were in a high crime neighborhood, they also failed to testify that they had a suspicion of a particular crime, as in the seminal case of *Terry v. Ohio*, 392 U.S. 1, 6-7, 23 (1968) (the officer had a reasonable suspicion to believe that the suspects were " 'casing' " a particular store in order to rob it). Although the lead opinion tries to invent suspicion of a crime for them (breaking and entering), it was not a crime that the officers testified to suspecting. The lead opinion dismisses all of defendant's cited cases as distinguishable because none "involved a suspect attempting" to break into and enter a nearby building. *Supra* ¶ 38. However, that was not the articulated reason for this stop either, as the evidence shows.

¶ 110　The trial court found that the officer asked defendant to take his hands out of his pocket *before* the stop was effected, thereby using defendant's noncompliance to bolster the suspicion for the stop. However, the trial court's finding flips the order of the two events: (1) effecting the stop and (2) asking defendant to remove his hands from his pockets. The transcripts and the video

establish the reverse happened. Officer Rodriguez testified that, after he approached defendant on foot, he observed a bulge in defendant's pocket. The officer explained: "it was a street stop because he had a bulge and I was trying to see what was the bulge, what bulged."[5] Defense counsel asked the officer if defendant was "free to leave" at that moment, and the officer responded: "Not if I'm doing a street stop." The video clip shows Officer Rodriguez gripping the back of defendant's sweatshirt, while yelling: "Show me your f*** hands." Since defendant's noncompliance to the officer's yelling occurred after the stop was effected, it cannot be part of the reasonable suspicion supporting the stop.

¶ 111   Defendant's noncompliance could possibly be a factor justifying a protective pat-down search if the stop was justified at its inception, but it cannot be a factor justifying the stop itself, because it occurred after the stop was already underway, based on the evidence. See *People v. Flunder*, 2019 IL App (1st) 171635, ¶¶ 33-34 (a valid frisk requires, first, a valid stop).

¶ 112   The lead opinion finds: "Soto's body camera recorded [Officer] Rodriguez stating that defendant 'saw [him], then [defendant] turned back,' suggesting that defendant acted evasively upon seeing the officers." *Supra* ¶ 34. This finding distorts the order of events.

¶ 113   The video footage from Officer Soto's body camera starts with the officers inside the vehicle. However, the audio is turned off, so we have no idea what the officers discussed when they first observed defendant. The audio is not turned on until after the vehicle stops and Officer Soto exits and Officer Rodriguez has already stopped defendant. The first moment that defendant appears on the body camera footage, Officer Rodriguez is already gripping the back of defendant's

---

[5]The video clip shows wires dangling from the bulge. Officer Rodriguez testified that he believed that the bulge could have been a weapon. The bulge turned out to be a car radio.

sweatshirt and pulling defendant toward the back hood of the police vehicle. This is immediately after defendant just ascended the stairs of the abandoned building and turned back as Officer Rodriguez approached. While in the process of handcuffing defendant, Officer Rodriguez commented, "You just saw me and you turned back," which defendant had just done on the stairs.

¶ 114   In the end, all we are left with is a man running in a cold Chicago rain,[6] with a bulge in his pocket, up a stoop, and toward shelter. I cannot find that this amounts to a reasonable suspicion of criminal activity, nor should anyone.

¶ 115   I realize that, in this particular case, the officers did discover stolen goods on defendant's person. However, it is only the individuals with stolen goods or other contraband who appear before us. The purpose of the fourth amendment's exclusionary rule is to protect all of us by deterring fourth amendment violations by the police. *Terry*, 392 U.S. at 12 ("the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging" unreasonable seizures for all citizens).

¶ 116   Since I find that the police lacked reasonable suspicion to make the stop, I would suppress the property seized from defendant and his answers in response to the officers' questions about the property.

¶ 117   In addition, I find that the officers violated defendant's *Miranda* rights. In the case at bar, it is undisputed that the police officers asked defendant questions about the seized property without first providing him *Miranda* warnings, after he was already stopped. There was no voluntary encounter here, on the evidence presented. In this case, the evidence showed that Officer

---

[6]The video clip shows that the windshield wipers of the officers' vehicle are swiping back and forth, that the rain is striking the windshield, and that the sky is grey and cloudy.

Rodriguez's conduct indicated defendant could not and would not be able to leave, which shows the importance of giving *Miranda* warnings. The lead opinion finds no *Miranda* violation by relying on *People v. Jeffers*, 365 Ill. App. 3d 422 (2006). However, the difference between this case and *Jeffers* is also the difference between a pea and an elephant. The *Jeffers* court found that *Miranda* warnings were not required where the defendant was not "physically restrained in any way" and was "free to walk about on his own." *Jeffers*, 365 Ill. App. 3d at 430. By contrast, in the case at bar, the video establishes that defendant was handcuffed against the hood of a police vehicle and could not leave voluntarily. The officer's testimony supports that he could not leave voluntarily.

¶ 118   In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the United States Supreme Court found that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation" without first providing "procedural safeguards effective to secure the privilege against self-incrimination." The *Miranda* Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. In the case at bar, there is no dispute that the officers "initiated" questioning, so the issue concerns whether he was "deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. The evidence shows that he was.

¶ 119   In *Berkemer v. McCarty*, 468 U.S. 420, 437-39 (1984), the United States Supreme Court found that a routine traffic stop does not ordinarily require *Miranda* warnings. The Court explained that the "circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." *Berkemer*, 468 U.S. at 438. The key is the "nonthreatening

character of detentions of this sort." *Berkemer*, 468 U.S. at 440; see also *Jeffers*, 365 Ill. App. 3d at 430 (finding no *Miranda* violation where "there was nothing coercive or threatening in [the officer's] conduct toward defendant"). However, even a traffic stop may become custodial for purposes of *Miranda*, if the defendant is "subjected to restraints comparable to those associated with a formal arrest." *Berkemer*, 468 U.S. at 441.

¶ 120   After analyzing both *Miranda* and *Berkemer*, the *Jeffers* court, upon which the lead opinion relies, found that "the fact that defendant was unable to leave, and thus was subject to a *Terry* seizure, is not dispositive on the issue of whether defendant was 'in custody' for purposes of *Miranda*." *Jeffers*, 365 Ill. App. 3d at 429. "The question *** is whether 'at any time between the initial stop and the arrest,' " was the defendant " 'subjected to restraints comparable to those associated with a formal arrest.' " *Jeffers*, 365 Ill. App. 3d at 429 (quoting *Berkemer*, 468 U.S. at 441). The *Jeffers* court concluded that the *Jeffers* defendant before it was not subject to custodial interrogation where he was not "physically restrained in any way" and "was free to walk about on his own." *Jeffers*, 365 Ill. App. 3d at 430.

¶ 121   By contrast, in the case at bar, the officers gripped the back of defendant's sweatshirt, pulling him toward the hood of the police vehicle, where he was immediately handcuffed, searched, and interrogated about the seized items. " '[T]he accepted test is what a reasonable person, innocent of any crime, would have thought had he or she been in the defendant's shoes.' " *Jeffers*, 365 Ill. App. 3d at 427 (quoting *People v. Braggs*, 209 Ill. 2d 492, 505-06, (2003)). I find that a reasonable person in defendant's shoes would not have believed that he was about to be released and sent on his way. The officer's testimony verified that point, as he testified, basically, that defendant could not leave.

¶ 122    It would be improper to find that *Miranda* principles do not apply to *Terry* stops; rather a *Miranda* analysis must be applied to all stops, as it must be applied to any situation, to determine if *Miranda* warnings are required. There are two different types of analyses: a fourth amendment analysis to determine whether a stop occurred that requires reasonable suspicion and a fifth amendment analysis to determine whether the coercive aspects of custodial interrogation are present such that *Miranda* warnings are required. Thus, for example, a person may not be free to leave and may be detained for purposes of a *Terry* stop, but *Miranda* warnings may not be required if a reasonable person in the defendant's shoes would believe that he or she is about to be released and would shortly be set on his or her way and the coercive aspects that *Miranda* seeks to guard against are not present. *Berkemer*, 468 U.S. at 437-38. Such was the case in the routine traffic stop in *Berkemer*. However, this was not the case here.

¶ 123    The Court in *Berkemer* was quick to point out that *Miranda* warnings could still be required, even in a traffic stop, if coercive circumstances were present that could overcome one's fifth amendment rights. *Berkemer*, 468 U.S. at 440 (a motorist who is "subjected to treatment that renders him 'in custody' for practical purposes" is "entitled to the full panoply of protections prescribed by *Miranda*").

¶ 124    In the case at bar, the video discloses that the approximately 5 foot, 4 inch defendant was physically pulled by the back of his sweatshirt by the taller officer to the hood of the police vehicle, while the officer shouted "Show me your f*** hands," and was then handcuffed; searched; asked processing questions such as full name, date of birth, and address; and interrogated.

¶ 125   After being pulled, yelled at, handcuffed, and searched to reveal a car radio with dangling wires and screw drivers and asked processing questions, a reasonable person in defendant's shoes would believe that he was, or was in the process of being, arrested.

¶ 126   The lead opinion finds that the *Miranda* issue was forfeited because the motion to suppress was not made before trial. While section 114-11 of the Code of Criminal Procedure of 1963 generally requires a pretrial motion to suppress a "confession," it also expressly provides trial courts with the authority to consider such motions during trial. 725 ILCS 5/114-11(a), (g) (West 2018); see also *People v. Humphries*, 223 Ill. App. 3d 81, 86-87 (1991) ("it is within the sound discretion of the trial court to entertain a motion to suppress *** after trial has begun" based on a *Miranda* violation).[7] In the instant case, when defendant made his motion, the trial court observed that the motion should have been made before trial. Defendant then argued that the trial court should still consider the motion. The trial court then exercised its discretion to consider the motion and decide it, finding that *Miranda* did not attach "at that point." The lead opinion finds that the trial court denied defendant's motion, in part, because the motion was untimely. *Supra* ¶ 57. However, that finding runs counter to the record. The record is clear that the trial court chose to consider the motion, and the sole reason it gave for denying the motion was its substantive finding that *Miranda* did not attach at that point. As defendant notes in his brief to us, the State raised no objection to the trial court's consideration of defendant's oral motion at that time. *People v. De La Paz*, 204 Ill. 2d 426, 433 (2003) ("It is well established that the State may waive waiver."); *People v. Skillom*, 2017 IL App (2d) 150681, ¶ 24 ("State can forfeit forfeiture").

_____

[7]The lead opinion relies on *People v. Causey*, 341 Ill. App. 3d 759 (2003), which found that a defendant can rely on trial evidence on appeal only if he raised his suppression motion again midtrial.

¶ 127    The lead opinion finds that the motion should not have been considered because the statutory exceptions did not apply. *Supra* ¶¶ 53-57. In essence, the lead opinion finds that the trial court abused its discretion in considering defendant's motion. However, once the finding was made, I cannot find forfeiture where a defendant raises the issue both during trial and in a posttrial motion. See *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007); *Humphries*, 223 Ill. App. 3d at 87 (the purpose of the statute was "to prevent the common law prohibition against filing motions to suppress during the trial from prevailing over a defendant's constitutional rights"). Since the issue was not forfeited, the State has the burden to prove the error harmless beyond a reasonable doubt, which it did not argue.

¶ 128    For the foregoing reasons, I must respectfully dissent.

**No. 1-18-2170**

| | |
|---|---|
| **Cite as:** | *People v. Lozano*, 2022 IL App (1st) 182170 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CR-3154; the Hon. James B. Linn, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Pamela Rubeo (Cara Filippelli, law student), of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (John E. Nowak, Enrique Abraham, and Brenda K. Gibbs, Assistant State's Attorneys, of counsel), for the People. |