**2023 IL 128609**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

(Docket No. 128609)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
FRANCISCO LOZANO, Appellant.

*Opinion filed September 21, 2023.*

CHIEF JUSTICE THEIS delivered the judgment of the court, with opinion.

Justices Neville, Overstreet, Holder White, Cunningham, Rochford, and O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1    "No right is held more sacred *** by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." (Internal quotation marks omitted.) *Terry v. Ohio*, 392 U.S. 1, 9 (1968). To justify intruding on a person's constitutionally protected interest to remain free from an

unreasonable search and seizure, a police officer must "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. The question here is whether a person's act of running in the rain while holding the front of his pocket provided police officers with a reasonable suspicion of criminal activity to justify an investigatory stop consistent with the fourth amendment (U.S. Const., amend. IV) and the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 6). Under these facts, we find that the officers lacked reasonable suspicion to stop the defendant. Accordingly, we reverse the trial and appellate courts' judgments.

¶ 2                                   BACKGROUND

¶ 3        Chicago police officers arrested defendant Francisco Lozano on February 20, 2018. The State subsequently charged him with burglary (720 ILCS 5/19-1(a) (West 2018)) and possession of burglary tools (*id.* § 19-2(a)). Weeks later, under section 114-12(a)(1) of the Code of Criminal Procedure of 1963 (725 ILCS 5/114-12(a)(1) (West 2018)), defendant moved to suppress certain evidence that police officers recovered when they arrested him—namely, a car radio, a wallet, and two screwdrivers.

¶ 4        In his motion to suppress, defendant argued that, when the officers stopped, detained, and searched him, they neither possessed a warrant to search him nor saw him committing any crimes. Additionally, defendant argued that no circumstances existed that would cause the officers to reasonably suspect that he had committed or was about to commit any crimes. See *id.* § 107-14(a) ("A peace officer *** may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense as defined in Section 102-15 of this Code ***."). According to defendant, because the stop was unlawful, any evidence that the officers recovered must be suppressed. Defendant further contended that the officers lacked reasonable suspicion that he was armed and dangerous, making their frisk of him unlawful as well.

¶ 5        On May 21, 2018, the Cook County circuit court conducted a hearing on defendant's motion. Chicago police officer Eulalio Rodriguez testified that on February 20, 2018, at approximately 1:40 p.m., he and his partner were driving

southbound on Kedzie Avenue in an unmarked car. Rodriguez did not state that he and his partner were responding to a specific report of crime or a 911 call; rather, the officers were on patrol. Rodriguez also did not describe the neighborhood as a high-crime area.

¶ 6    As Rodriguez was driving, the officers happened upon defendant, who was "running at a fast rate of speed toward Kedzie." Rodriguez noted that defendant appeared to be holding his front pocket. He testified that he did not see defendant committing any crime or violating any ordinance. He also acknowledged that it was raining that day and wet outside.

¶ 7    Rodriguez made a U-turn on Kedzie Avenue so that the officers could stop defendant. He testified that, after he turned the car and approached defendant, defendant fled up the stairs of what appeared to be an abandoned building. Rodriguez pursued defendant. He ordered him to stop and to remove both hands from his pocket. At that point, Rodriguez saw a "big bulge" in defendant's pocket. In response to the officer's command, defendant removed his left hand from his pocket.

¶ 8    Rodriguez confirmed that defendant was already running when he encountered him; defendant did not start running once he saw the officer. Rodriguez explained that he tried to stop defendant before he ran up the stairs to "conduct a field interview [to] ask him why he was running." The officer also wanted "to see what was the bulge," and he later asserted that the bulge could have been a weapon. According to Rodriguez, defendant was not free to leave at that time.

¶ 9    Rodriguez testified that, after he handcuffed defendant, he touched his hooded sweatshirt and felt a rectangular box. He reached inside defendant's front pocket and recovered a wallet, two screwdrivers, and a radio. The officers then arrested him. Rodriguez acknowledged that he did not have a warrant to either search or arrest defendant.

¶ 10    Officer Jennifer Soto, Rodriguez's partner on February 20, 2018, had activated her body camera. At the hearing, the parties stipulated that she would testify that a video, marked as petitioner's exhibit 1, accurately reflected the incidents that happened at 522 North Kedzie Avenue on February 20, 2018, at 1:39 p.m. After the trial court admitted the video into evidence, defendant published it to the court.

¶ 11       In relevant part, the video showed that the sky was gray that afternoon and the windshield wipers on the officers' vehicle had been activated. The first time that defendant appeared on the video, he was standing near the bottom of the apartment building's stairs and was facing Rodriguez, who was walking toward him. Rodriguez grabbed defendant's arm and walked him toward the unmarked police vehicle as both officers ordered defendant to remove his hands from his pocket. The video showed that the front pocket of defendant's sweatshirt appeared to contain a rectangular object.

¶ 12       Rodriguez directed defendant's hands to the hood of the car and began to handcuff him. Defendant appeared to be cooperating with the officers' commands. Rodriguez asked defendant where he was going and stated that defendant had "turned back" when he saw the officers. Defendant replied that he was "going back in the house." Rodriguez asked what defendant "had on [him]," to which defendant replied, "nothing sir." Rodriguez asked defendant "who live[d]" in the building he had attempted to enter. Defendant claimed that his friend lived there.

¶ 13       After he finished handcuffing defendant, Rodriguez asked what he was "going to find," as he reached into defendant's pocket and began removing items from his shirt. Rodriguez took from defendant's shirt a wallet, followed by screwdrivers and then a car radio. Rodriguez and defendant engaged in further conversation, but the video did not capture what was said. Soto asked defendant why his hands were bleeding, but his response was unclear. Rodriguez continued to sift through defendant's pockets while Soto asked him for identification. Defendant claimed that he did not have any at the time. At the officer's request, defendant gave her his name, birthdate, and street address.

¶ 14       The parties rested after the court finished reviewing the video at the hearing. The trial court first found that Rodriguez was credible. The court found that defendant had "attract[ed] his attention [by] running with some kind of bulge in his pants." The court stated that, after Rodriguez made a U-turn, defendant ran "toward an abandoned building trying to further get away from the officers." The court also asserted that, when defendant refused to show the officers his hands, the officers "at that point detain[ed] him, thinking he might have a gun." Accordingly, the trial court found that the officers had not violated the fourth amendment by stopping or frisking defendant, and it denied his motion to suppress evidence.

¶ 15        Defendant's bench trial was conducted on June 21, 2018. The parties stipulated to Rodriguez's testimony from the suppression hearing. Rodriguez also testified at defendant's trial. He stated that, when he recovered the radio, wallet, and screwdrivers from defendant, Rodriguez asked defendant where he had gotten the items. Defendant told him that he had found the car radio on a street corner several blocks away and that he found the wallet in a nearby alley. Rodriguez confirmed that defendant was handcuffed at the time he made the statements and that officers had not provided him with *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)).

¶ 16        At a sidebar, defense counsel moved to suppress defendant's statements. The trial court denied his motion, asserting that "[i]t's a pretrial motion" and "we are in the middle of trial." The trial court also stated that it was unsure whether *Miranda* "attached" at the time defendant made the statements. The court advised defense counsel to move on. During further examination of Rodriguez, the officer noted that the wallet was worth roughly $30 and the car radio was worth roughly $250.

¶ 17        Soto testified that, when she looked through the wallet that Rodriguez recovered from defendant, she found a student identification card from a nearby high school. She went to the high school and spoke with the student, Jennelly Cherrez.

¶ 18        Cherrez testified that she drove to school around 7:45 a.m. on February 20, 2018. She parked her car near the intersection of Kedzie Avenue and Franklin Boulevard, less than one block away from her school. Cherrez explained that she left her wallet inside the middle compartment and that she left her purse in the back seat of the car.

¶ 19        Shortly after 2 p.m. that day, Officer Soto met with Cherrez at her school. Soto confirmed that the wallet belonged to her. Cherrez then led officers to the street where she had parked. She found that the window on the right passenger side of the car had been broken, the radio was missing, and the compartment where she had left her wallet was open. Cherrez testified that she did not know defendant and had not given him permission to enter her car or to possess her wallet and radio that day.

¶ 20        The trial court observed that, when the officers detained defendant, he possessed stolen property that had been taken in a burglary that day, along with

screwdrivers. The court found that those tools were necessary to loosen the radio and pull it from the car. The trial court also determined that defendant had been "evasive with the police, giving stories that" were unreasonable. The court ruled that his possession of the stolen goods, "co-mingling with the burglary," and evading the police sufficed to find defendant guilty on both counts.

¶ 21    The trial court sentenced defendant to concurrent sentences of three years' imprisonment on the burglary count and two years' imprisonment for possession of burglary tools. In August 2018, defendant moved the trial court to reconsider its finding of guilt or, in the alternative, to set aside the guilty finding and grant him a new trial. The court denied defendant's motion. Defendant filed a notice of appeal.

¶ 22    Issuing three separate opinions, the appellate court affirmed defendant's convictions and sentences. The lead opinion found that Rodriguez had reasonable suspicion to conduct a *Terry* stop of defendant where Rodriguez saw defendant running on a rainy day in February, alone, with his hands either in or holding the front pocket of his sweatshirt. 2022 IL App (1st) 182170, ¶ 34. It observed that, when Rodriguez made a U-turn and drove in defendant's direction, defendant ran toward what appeared to be an abandoned apartment building and tried to enter it. *Id.* The lead opinion concluded that defendant's actions qualified as " 'strange behavior,' " which supported a finding of reasonable suspicion sufficient to justify the initial *Terry* stop. *Id.*

¶ 23    "At a minimum," the lead opinion concluded, "Rodriguez could have suspected that defendant was attempting to break into an abandoned building." *Id.* Acknowledging that the officer did not list that factor in his reasons for stopping defendant, the lead opinion determined that it was "not limited to the officers' subjective reasons for conducting a *Terry* stop." *Id.* ¶ 39. The lead opinion also held that "Rodriguez's *Terry* frisk was justified to determine whether defendant was holding a weapon in his sweatshirt pocket." *Id.* ¶ 46. The lead opinion then ruled that defendant's motion to suppress statements was untimely and that *Miranda* did not apply to this situation. *Id.* ¶ 57. Finally, the lead opinion held that sufficient evidence supported defendant's convictions. *Id.* ¶¶ 67-68.

¶ 24    The concurring justice considered "the *Terry* question very close but ultimately agree[d] that the record support[ed] the validity of the *Terry* stop." *Id.* ¶ 75 (Ellis, J., specially concurring). The concurring justice found that "the officers violated

*Miranda* when they questioned defendant and that it was error to introduce that testimony" but "would find that error harmless beyond a reasonable doubt under the circumstances." *Id.*

¶ 25    The dissenting justice observed that, at the suppression hearing, Rodriguez testified that he stopped defendant for two reasons: (1) he wanted to know " 'why he was running' " and (2) he wanted " 'to see what was the bulge.' " *Id.* ¶ 99 (Gordon, P.J., dissenting). He concluded that "a man running in a cold Chicago rain, with a bulge in his pocket, up a stoop, and toward shelter" did not provide the police with "a reasonable suspicion of criminal activity." *Id.* ¶ 114. The dissenting justice further found that the officers violated defendant's *Miranda* rights when they indisputably asked defendant questions about the seized property without first providing him with *Miranda* warnings after he was already stopped. *Id.* ¶ 117.

¶ 26    This court allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2021).

¶ 27                      ANALYSIS

¶ 28    At issue is whether the trial court erred in denying defendant's motion to suppress evidence because the police officers subjected him to an unlawful search and seizure in violation of the fourth amendment and article I, section 6, of the Illinois Constitution.

¶ 29    When reviewing a trial court's ruling on a motion to suppress evidence, this court affords deference to the trial court's factual findings and will reject those findings only if they are against the manifest weight of the evidence. *People v. Lindsey*, 2020 IL 124289, ¶ 14. That said, we review the ultimate question of whether the evidence should be suppressed *de novo*. *People v. Colyar*, 2013 IL 111835, ¶ 24; see also *People v. Crane*, 195 Ill. 2d 42, 51 (2001) ("A reviewing court *** remains free to engage in its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted.").

¶ 30    "Both the fourth amendment to the United States Constitution and article I, section 6, of the Illinois Constitution of 1970 guarantee the right of individuals to

be free from unreasonable searches and seizures." *People v. Carter*, 2021 IL 125954, ¶ 22. This court has interpreted section 6's search and seizure provision in a manner that is consistent with the United States Supreme Court's fourth amendment jurisprudence. *People v. Pittman*, 211 Ill. 2d 502, 513 (2004).

¶ 31     This case involves an encounter between a private citizen and a police officer on a public street, and it is governed by *Terry*. In *Terry*, a detective with more than 30 years' experience was patrolling a particular area for shoplifters and pickpockets. 392 U.S. at 5. The officer saw two men look into a store window, walk a short distance, turn around, and then walk back toward the corner to again look into the same store window. *Id.* at 6. When the men repeated this ritual numerous times, the officer suspected them of "casing a job, a stick-up," and "he considered it his duty as a police officer to investigate further." (Internal quotation marks omitted.) *Id.* He approached the men, informed them that he was a police officer, and asked for their names. *Id.* at 6-7. After the men " 'mumbled something' in response," the officer grabbed the petitioner, spun him around, and patted down the outside of his clothing. *Id.* at 7. The officer felt a pistol in the petitioner's overcoat, and he reached inside the coat to remove it. *Id.*

¶ 32     In denying the petitioner's motion to suppress, the trial court concluded that, based on his experience, the officer " 'had reasonable cause to believe *** that the defendants were conducting themselves suspiciously, and some interrogation should be made of their action.' " *Id.* at 8. The court also determined that "the officer had the right to pat down the outer clothing of these men, who he had reasonable cause to believe might be armed." *Id.* The trial court further ruled that "a 'frisk' of the outer clothing for weapons" "was essential to the proper performance of the officer's investigatory duties." *Id.*

¶ 33     The question before the United States Supreme Court was "whether it is always unreasonable for a policeman to seize a person and subject him to a limited search for weapons unless there is probable cause for an arrest." *Id.* at 15. The Court observed that the fourth amendment "provides that the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." (Internal quotation marks omitted.) *Id.* at 8. To determine whether the search and seizure was unreasonable, the Court assessed (1) whether the officer's action was justified at its inception and (2) whether it was

reasonably related in scope to the circumstances that justified the interference in the first place. *Id.* at 19-20.

¶ 34   The Court explained that, to justify a search and seizure, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. The Court also concluded that

"[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed *and presently dangerous* to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." (Emphasis added.) *Id.* at 24.

¶ 35   Thus, a temporary detention and pat down for weapons will be upheld "as constitutionally permissible if two conditions are met." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009). First, to conduct a lawful investigatory stop, the police officer must reasonably suspect that the person apprehended is committing or has committed a criminal offense. *Id.* "When considering whether an officer was justified in making an investigatory stop, 'the facts should not be viewed with analytical hindsight, but instead should be considered from the perspective of a reasonable officer at the time that the situation confronted him.' " *People v. Scott*, 148 Ill. 2d 479, 503 (1992) (quoting *People v. Long*, 99 Ill. 2d 219, 229 (1983)). "Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Johnson*, 555 U.S. at 326-27.

¶ 36   In this case, defendant was seized when Rodriguez confronted him and ordered him to come down from the apartment building's stairs. See *People v. Thomas*, 198 Ill. 2d 103, 111 (2001) ("A person has been seized within the meaning of the fourth amendment *** when, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave."); see also *Terry*, 392 U.S. at 16 ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."). Accordingly, we must assess whether the facts available to Rodriguez when he encountered defendant on the stairs provided the officer with "a reasonable suspicion based upon

specific and articulable facts that the person has committed, or is about to commit, a crime." *People v. Brownlee*, 186 Ill. 2d 501, 518 (1999); see *United States v. Street*, 917 F.3d 586, 593 (7th Cir. 2019) ("To determine whether a *Terry* stop was reasonable, we 'must consider the totality of circumstances known to the officer at the time of the stop.' " (quoting *United States v. Quinn*, 83 F.3d 917, 921 (7th Cir. 1996))).

¶ 37  At the time of the seizure in this case, the facts available to the officer were that it was raining, defendant had been running and was holding the front of his sweatshirt as he ran, defendant attempted to run up the stairs of an apartment building upon encountering the officer, and there was a large bulge in the front of his sweatshirt. As Rodriguez explained at the suppression hearing, he tried to stop defendant before he ran up the stairs to "ask him why he was running" and because he wanted "to see what was the bulge." Although " 'reasonable suspicion' *** requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "The officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." (Internal quotation marks omitted). *Id.* at 123-24.

¶ 38  Among the factors that may support an officer's claim that he had reasonable suspicion to stop and frisk a person are whether "the stop occurred in a 'high crime area' " (*id.* at 124), whether the incident occurred late at night or in the early hours of the morning (*Adams v. Williams*, 407 U.S. 143, 147-48 (1972)), whether the person engaged in "unprovoked flight" from police officers (*Wardlow*, 528 U.S. at 125), and whether the person's behavior was consistent with the officer's knowledge of criminal activity (*Terry*, 392 U.S. at 6 ("after observing their elaborately casual and oft-repeated reconnaissance of the store window ***, [the officer] suspected the two men of 'casing a job, a stick-up' ")).

¶ 39  None of these factors weigh in favor of finding that the officers had reasonable suspicion to conduct a *Terry* stop. Based on Rodriguez's testimony, the officers were not responding to a particular report of crime in the area when they happened upon defendant. Neither Rodriguez nor Soto stated that the neighborhood was a high-crime area, and the stop occurred in the middle of the afternoon. Although defendant attempted to run up the apartment building's stairs when he saw

Rodriguez, the officer testified that defendant had been running from the first moment they saw him. Thus, his continued running cannot be seen as "unprovoked flight" from the officers. Further, Rodriguez did not testify that defendant's conduct conformed with his knowledge of criminal activity. He simply wanted to know why defendant was running and what item caused a bulge in defendant's pocket.

¶ 40      The facts available to Rodriguez at the time of the seizure demonstrate that he lacked reasonable suspicion that defendant had committed or was about to commit a crime. Accordingly, we hold that the *Terry* stop in this case was unlawful. See *State v. Weyand*, 399 P.3d 530, 535-36 (Wash. 2017) (*en banc*) (holding that a police officer's belief that the defendant "was acting suspiciously by walking quickly to his car and looking up and down the street" after leaving a " 'known' drug house" did not provide the reasonable suspicion of criminal activity necessary to justify an investigatory stop); *People v. Croft*, 346 Ill. App. 3d 669, 675-76 (2004) (an officer's belief that it " 'just seemed strange' " for the defendant to walk his bicycle down a street at 11:15 p.m. in a neighborhood where acts of vandalism had occurred days before was insufficient to establish reasonable suspicion that a crime had been or was about to be committed); see also *People v. Shipp*, 2015 IL App (2d) 130587, ¶ 46 ("That defendant placed his hands in his pockets was, standing alone, insufficient, especially when it was January and defendant had no gloves.").

¶ 41      Before this court, the State asserts that the officers "could have reasonably concluded that defendant was either carrying and concealing contraband or trying to break into an abandoned building, or both." Thus, they contend that the officers had the reasonable suspicion of criminal activity necessary for a valid investigatory stop under *Terry*. Although the State attempts to piece together facts to justify an investigatory stop, the question for this court is whether it was objectively reasonable for the officers to suspect that criminal activity was afoot when defendant was running alone in the rain with his hands in his pocket at 1:39 p.m. in a neighborhood that, so far as we know from the record, was not a particularly high-crime area. See *People v. Timmsen*, 2016 IL 118181, ¶ 18 (observing that "a reasonable suspicion determination *** considers the totality of the circumstances of each case"). We conclude that it was not objectively reasonable for the officers to make an investigatory stop under these circumstances.

¶ 42 We further hold that the officer's frisk of defendant was unlawful when Rodriguez lacked any reasonable suspicion that defendant was armed and dangerous. See *Thomas*, 198 Ill. 2d at 109 (noting that the validity of an investigatory stop "is a separate question from whether a search for weapons is valid"). A search in this context "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Terry*, 392 U.S. at 26. As we have observed, "[a] weapons frisk is valid only when the officer has reason to believe that a particular individual is armed and dangerous." *People v. Flowers*, 179 Ill. 2d 257, 266 (1997).

¶ 43 Here, defendant was handcuffed when Rodriguez searched him, and he had not been resisting the officers even before he was handcuffed. Rodriguez asserted that he conducted a protective pat down of defendant's sweatshirt and felt "a rectangular square box, which [was] a radio." Nonetheless, he reached into defendant's pocket and retrieved a wallet, two screwdrivers, and the radio. Nothing in either Rodriguez's testimony or his conduct on the video suggests that he or Soto believed that defendant was presently dangerous. See *id.* at 263 ("The sole justification for the search allowed by the *Terry* exception is the protection of the police officer and others in the vicinity, not to gather evidence.").

¶ 44 When the police violate a defendant's constitutional rights by, for instance, conducting an unconstitutional search or seizure, the constitutional violation is termed a " 'poisonous tree.' " *People v. Winsett*, 153 Ill. 2d 335, 351 (1992). Any evidence that the State obtains by exploiting the constitutional violation is subject to suppression as the " 'fruit' " of that poisonous tree. *Id.*; see *Terry*, 392 U.S. at 15 ("[C]ourts still retain their traditional responsibility to guard against police conduct *** which trenches upon personal security without the objective evidentiary justification which the Constitution requires. When such conduct is identified, it must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials."). "[T]he exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and *** evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." (Internal quotation marks omitted.) *Utah v. Strieff*, 579 U.S. 232, 237 (2016).

¶ 45 Yet, "evidence which comes to light through a chain of causation that began with an illegal seizure is not *per se* inadmissible." *People v. Henderson*, 2013 IL 114040 ¶ 34. Instead, "a court must consider whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the taint imposed upon that evidence by the original illegality." (Internal quotation marks omitted.) *Id.* ¶ 33.

¶ 46 In this case, Rodriguez improperly searched and seized defendant within a matter of moments, and no intervening circumstance removed the taint from the original illegality. Thus, the evidence that officers obtained from Rodriguez's unlawful search and seizure of defendant was subject to suppression as fruit of the poisonous tree. The trial court erred in ruling otherwise.

¶ 47 Without the evidence that was improperly obtained, the State cannot prove the charges for burglary and possession of burglary tools. Therefore, we reverse defendant's convictions outright. See, *e.g.*, *People v. Eubanks*, 2019 IL 123525, ¶ 100 ("Because the State cannot prove the aggravated DUI charge without that evidence, we affirm the appellate court's judgment reversing that conviction outright.").

¶ 48                                    CONCLUSION

¶ 49 For these reasons, we hold that the trial court erred in denying defendant's motion to suppress evidence, and we reverse defendant's convictions outright.

¶ 50 Judgments reversed.