2024 IL App (1st) 232064-U

No. 1-23-2064B

Filed February 20, 2024

Fourth Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 22 CR 8296-01 |
| | ) | |
| RONDELL COLEMAN | ) | The Honorable |
| | ) | Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Justice Hoffman concurred in the judgment.
Justice Ocasio dissented.

**ORDER**

¶ 1    *Held*:  The trial court's finding that no conditions of pretrial release could mitigate the threat the defendant posed to the community was not against the manifest weight of the evidence.

¶ 2    Rondell Coleman appeals the circuit court's order denying his "Motion to Grant Pretrial Release with Conditions." Specifically, he argues the circuit court erred in finding that no conditions of pretrial release could mitigate the threat he posed to the community. For the following reasons, we affirm.

¶ 3        Coleman was charged with unlawful use of a weapon (UUW) in 2022 stemming from an incident in which he was alleged to have illegally possessed a handgun with an affixed laser sight. After pleading guilty, Coleman was placed in the First Time Weapon Offense Program (Program) (730 ILCS 5/5-6-3.6 (West 2022)) for a period of two years. Pursuant to the Program, the circuit court deferred further proceedings pending either completion of the Program or the filing of a petition alleging violation of a term or condition of the Program. See *id.* § 5-6-3.6(c).

¶ 4        In July 2023, Coleman was arrested in connection with a robbery that occurred on April 1, 2023. He appeared before the circuit court on July 27, 2023. At that time, the State filed a petition alleging that Coleman violated the conditions of the Program by committing additional felony offenses. The court ordered Coleman detained.[1]

¶ 5        The next month, Coleman was charged in a separate case (no. 23 CR 9236) with robbery, theft, aggravated battery, and unlawful restraint, stemming from the April 1 incident. The circuit court set a monetary bail condition requiring the posting of a $50,000 bond.[2]

¶ 6        Subsequently, on October 18, 2023, Coleman filed a "Motion to Grant Pretrial Release with Conditions." He appeared before the circuit court the same day. Through counsel, Coleman indicated that he was not challenging the $50,000 bond condition in his new case but was only seeking relief from the no-bail order in his UUW case. In the written motion and oral presentation, defense counsel contended that the Pretrial Fairness Act[3] (PFA) (P.A. 101-652, § 10-255, eff. Jan. 1, 2023) (amending article 110 of the Code of Criminal Procedure of 1963), which became effective on September 18, 2023,[4] applied to Coleman's UUW case. Therefore, counsel argued,

---

[1]A report of this proceeding is not in the record before us.
[2]A report of this proceeding is not in the record before us.
[3]Pretrial Fairness Act is an unofficial title but the legislation is commonly referred to by this name. *Rowe v. Raoul*, 2023 IL 129248, ¶ 4, n. 1.
[4]See *Rowe*, 2023 IL 129248, ¶ 52 (lifting stay and setting the effective date as September 18, 2023).

the court was required to consider releasing Coleman from custody with appropriate conditions pending a hearing on or other disposition of the pending petition. Alternatively, the defense submitted that even if the PFA did not apply, the court retained discretion to release Coleman on the pending petition and the considerations set forth in the PFA were relevant to the court's determination.

¶ 7        In accord with the PFA, Coleman argued that the State could not demonstrate that he "poses a real and present threat to the safety of any person or persons or to the community." See 725 ILCS 5/110-6.1(e)(2) (West 2022). To support that Coleman did not pose a "real and present threat," defense counsel noted that Coleman, age 19, actively participates with a neighborhood religious ministry known as Precious Blood Ministry of Reconciliation (PBMR), which is dedicated to restorative justice. Counsel further noted that Coleman helps care for his diabetic mother and maintains strong familial and community relationships despite hardships, including poverty, losing his father at a young age, and losing close friends to violence. In addition, Coleman is a high school student with good attendance and no disciplinary record. Further, the offenses charged in Coleman's new case did not allege that a firearm or other weapon was involved.

¶ 8        Even if Coleman were found to pose a threat, counsel argued, the State cannot prove that "no condition or combination of conditions [of release] can mitigate" that threat. See *id*. § 110-6.1(e)(3). His motion asserted that, in addition to conditions the court could impose, PBMR, his legal team, and his family have formulated a "strong release plan that will provide structure and support." The plan would " 'provide more intense oversight' and 'double down on structuring [Coleman's] days.' " Conditions such as a curfew and requirements to attend school, programming, and therapy would fill days from morning to night. Coleman attached letters from six individuals associated with PBMR and a school counselor expressing their positive experiences with and

assessments of Coleman as well as their commitment to supporting him if he is released from custody. He also attached a six-page report compiled by Linsday Perlmutter, a licensed clinical social worker associated with a University of Loyola Chicago Law School clinic. Perlmutter's report gives a comprehensive account of Coleman's background, his circumstances before his July 2023 arrest, and programming he participated in while held in the Cook County jail. She further outlines a "Release Plan" and recommends these conditions as "the best intervention" for Coleman. In addition, Coleman attached certificates and transcripts indicating the programming he completed while incarcerated. Based on the exhibits supporting his motion, Coleman argued that the proposed release plan would mitigate any safety threat the court might find him to pose.

¶ 9    The State argued that the PFA did not apply to the pending petition in the UUW case. The State agreed, however, that the court retained discretion to release him but argued it should exercise its discretion to continue detaining him. Further, the State indicated that it would have filed a petition to detain Coleman if he had requested to be released in his new case. In response to the court's question, the State indicated it would file a petition to detain Coleman in the UUW case if the PFA were to apply.

¶ 10    Nonetheless, the State argued that the facts of the new case demonstrated that Coleman posed a danger to the community and no condition or set of conditions could "guarantee the safety of any individual or the community." According to the State's proffer, Coleman went to a car wash and attacked an employee. He repeatedly punched and kicked the 59-year-old man while demanding he hand over money. The victim had collected approximately $2200 in rent payments earlier that day, mostly in $100 bills. A co-worker at the car wash had contacted Coleman to inform him that the victim possessed a large amount of cash. After the beating, Coleman stole the victim's wallet and fled. Less than two hours later, Coleman posted an image of himself on social media

holding $100 bills along with a caption referring to the robbery. The victim sustained serious injuries and was admitted to the hospital. When police officers arrived at Coleman's home on May 2 to arrest him, Coleman locked the door and refused their commands.[5] Coleman dropped his cellphone during the encounter, which police recovered. A search of the phone revealed communications between Coleman and the victim's co-worker preceding the robbery.

¶ 11        The State noted that the Program afforded incentive to comply with its conditions, including to not commit additional offenses. Had he successfully completed the Program, Coleman would have avoided a conviction. See 730 ILCS 5/5-6-3.6(c) (West 2022) (providing that "[u]pon fulfillment of the terms and conditions of the Program, the court shall discharge the person and dismiss the proceedings against the person."). Additionally, the State noted that the significant community support Coleman relies on was already in place before and during the time of the robbery. Thus, the State submitted that no conditions of release could mitigate the threat Coleman poses to the safety of the community.

¶ 12        Defense counsel responded that Coleman would be subject to more stringent conditions if released than those he was under at the time of the robbery. He further noted that the PFA contemplates that detention only be ordered as a last resort when no condition or combination of conditions can mitigate any threat the court might find that Coleman poses. Counsel submitted that the court need not resort to ordering Coleman detained since adequate conditions exist to mitigate the threat he posed.

¶ 13        In ruling on Coleman's motion, the court noted that when Coleman was placed in the Program pursuant to his guilty plea agreement, the State agreed to forgo a UUW conviction and a

---

[5]The State's proffer included that Coleman's "probation officer" instructed him by phone to surrender. As we will explain later, the Program is not probation. It appears, however, that the Cook County Circuit Court's probation department administers the Program.

potential extended sentencing term based on Coleman's possession of a laser sight. The court observed that the many people supporting him were doing so in 2022 when he pled guilty in the UUW case and in 2023—when Coleman was alleged to have conspired with the victim's co-worker to commit a "vicious attack" on the 59-year-old man. The court continued:

> "Even looking at this case with the Pretrial Fairness Act applying to the probation case, it is my judgment that this individual does pose a serious threat to the safety of the community, not just the 59-year-old man *** but any person that presents themselves as an easy target for the defendant.

> It's my judgment also that there are no conditions in light of his choices following the weapons case, in light of all he had by way of support of those people here today and his support system at the time I explained to him what the first-time weapons offender would mean for him if he took advantage of it, if he took advantage of the structure that was in place.

> It's clear to the Court that there are no conditions short of detention that would protect society."

¶ 14    Coleman filed a timely notice of appeal on October 30, 2023, pursuant to Illinois Supreme Court Rule 604(h) (eff. Dec. 7, 2023). His notice of appeal indicated two grounds for relief. First, Coleman argued the State failed to prove he poses a real and present threat to the safety of any person or persons or the community. Specifically, he contends the State failed to show that his criminal or social history tends to indicate a " 'violent, abusive or assaultive nature' " and he presented contrary evidence demonstrating a "caring and kind nature." Second, Coleman asserted that the State failed to prove that no conditions or combination of conditions can mitigate any threat he poses where he presented "strong evidence of the support structure he would have if

released" along with "stringent conditions" the court could impose. For relief, Coleman requested that this court either order him released with conditions or remand the matter to the circuit court to order him released with the " 'least restrictive conditions.' "

¶ 15      Subsequently, Coleman filed a supporting memorandum. See Rule 604(h)(2) (providing for the filing of a memorandum in lieu of an appellate brief). The memorandum argued that (1) defendants accused of violating the conditions of the Program, like Coleman, are subject to the PFA pending resolution of a filed petition and (2) the circuit court's finding that the proposed release plan could not mitigate any threat he posed to the community is against the manifest weight of the evidence. The memorandum offers no argument challenging the circuit court's finding that Coleman poses a real and present threat to the safety of any person or persons or the community. The State did not file a responsive memorandum.

¶ 16      To argue that the PFA applies in his circumstances, Coleman relies on section 5-6-4(b) of the Unified Code of Corrections (Unified Code), which provides:

> "[t]he court shall admit the offender to pretrial release pending the hearing unless the alleged violation is itself a criminal offense in which case the offender shall be admitted to pretrial release on such terms as are provided in the Code of Criminal Procedure of 1963, as amended." 730 ILCS 5/5-6-4(b) (West 2022).

Section 5-6-4, however, applies to violations of probation, conditional discharge, supervision, or county impact incarceration. See *id.* § 5-6-4(a). Placement in the First Time Weapon Offense Program does not qualify as any of those four dispositions. Coleman, the State, and the trial court all referred to placement in the Program as probation. This is inaccurate. "Probation" means "a sentence or disposition of conditional and revocable release under the supervision of a probation officer." 730 ILCS 5/5-1-18 (West 2022). Probation is a sentence imposed following a conviction.

See *id*. § 5-1-19 (defining "Sentence" as "the disposition imposed by the court on a convicted defendant."). The Program is not a form of probation since it is not a sentence imposed following an entry of a judgment of conviction. See *id*. § 5-1-5 (defining "Conviction" as "a judgment of conviction or sentence entered upon a plea of guilty or upon a verdict or finding of guilty of an offense"). Rather, the Program is a form of diversion. See 730 ILCS 5/5-6-3.6(a) (contemplating "the creation of diversion programs for non-violent offenders"). "[D]iversion programs are alternative procedures to the traditional process of prosecuting criminal defendants and are intended to augment the criminal justice system where prosecution would be counterproductive, ineffective, or unwarranted." Debra T. Landis, Annot., *Pretrial diversion: statute or court rule authorizing suspension or dismissal of criminal prosecution on defendant's consent to noncriminal alternative*, 4 A.L.R. 4th 147, § 2(b) (1981). The Program provides that upon an eligible defendant's guilty plea to UUW, "the court, with the consent of the defendant and State's Attorney, may, without entering a judgment, sentence the defendant to complete the First Time Weapon Offense Program." 730 ILCS 5/5-6-3.6(c). A defendant may be placed in the Program for a period of 6 to 24 months. *Id*. § 5-6-3.6(d). After placement in the Program, the court defers further proceedings until either the conclusion of the period or the filing of a petition alleging a violation of a term or condition of the Program. *Id*. If the defendant has violated a term or condition, the court may enter judgment on its original finding of guilt and sentence the defendant as provided by law for UUW. *Id*. If the defendant fulfills the Program's terms and conditions, the court must discharge them and dismiss the proceedings. *Id*.

¶ 17 Nevertheless, we believe the PFA applies to Coleman's situation. Section 110-2 of the Code of Criminal Procedure of 1963 provides that "[a]ll persons charged with an offense shall be eligible for pretrial release *before conviction*." (Emphasis added.) 725 ILCS 5/110-2(a) (West 2022). As

we noted, a defendant placed in the Program is not convicted because no judgment has been entered. Such a defendant will only have a UUW conviction entered if the defendant is later found to have violated the terms or conditions of the Program. As we noted, upon a defendant's placement in the Program, their UUW case is essentially continued until either the conclusion of the period or the filing of a petition alleging a violation. Since Coleman has been charged with an offense and has not been convicted, he is among the "all persons" eligible for pretrial release as contemplated in section 110-2, which is to be liberally construed to effectuate the purposes of the PFA. 725 ILCS 5/110-2(e) (West 2022).

¶ 18      The PFA's applicability is only a threshold finding in our disposition of this appeal. Its applicability also means pretrial release can be denied pursuant to section 110-6.1 (*id.* § 110-6.1). *Id.* § 110-2(a). The State made a proffer and presented argument in accord with section 110-6.1, despite taking the position the PFA did not apply, and the court applied that section's standards in ruling on Coleman's motion.

¶ 19      Coleman's appeal focuses on only one of the findings required to deny pretrial release— that no conditions of release can mitigate the threat to the safety of the community. See *id.* § 110-6.1(e)(3). Thus, we confine our analysis to this issue.

¶ 20      Coleman argues that the circuit court's finding that the proposed release plan could not mitigate any threat he posed to the community is against the manifest weight of the evidence. We agree that manifest weight of the evidence is the appropriate standard. The trial court's determination as to whether less restrictive conditions can mitigate the threat a defendant poses to a person or the community involves a factual finding. Generally, we will reject the court's factual findings only if against the manifest weight of the evidence. *People v. Lozano*, 2023 IL 128609, ¶ 29. "A finding is against the manifest weight of the evidence where the opposite conclusion is

clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." (Internal quotation marks omitted.) *People v. Chatman*, 2024 IL 129133, ¶ 34. We recognize that other panels of this court have determined this finding should be reviewed under an abuse of discretion standard. See, *e.g.*, *People v. Whitaker*, 2024 IL App (1st) 232009, ¶ 68; *People v. Reed*, 2023 IL App (1st) 231834, ¶ 31; *People v. Inman*, 2023 IL App (4th) 230864, ¶ 11. Those decisions may have conflated factual findings with the trial court's ultimate decision regarding detention or conditions of release. An abuse of discretion standard properly applies to the latter, but not the former. See *People v. Trottier*, 2023 IL App (2d) 230317, ¶ 13 (applying "twofold" review: the manifest weight standard for the trial court's factual findings and abuse of discretion to the ultimate determination regarding pretrial release). To be sure, a court abuses its discretion when its decision relies on a factual finding that is against the manifest weight of the evidence. *People v. McDonald*, 2016 IL 118882, ¶ 32 ("an abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it."). We agree that we do not review the evidence anew (*Inman*, 2023 IL App (4th) 230864, ¶ 11), the trial court's determination "involves the trial judge's reasoning and opinion" (*Whitaker*, 2024 IL App (1st) 232009, ¶ 63), and this court is not in a superior position to weigh the factors and make the required individualized decisions (*id.* ¶ 67). Yet, we believe the manifest weight standard affords the appropriate level of deference to the trial court. In instances where it is not clearly evident whether less restrictive conditions can mitigate the threat a defendant poses to a person or the community, we will not substitute our judgment for the trial court's. But, to provide meaningful review, we should reverse when the opposite conclusion is clearly evident.

¶ 21     Here, Coleman argues the circuit court erred in determining that less restrictive measures could not mitigate the risk he posed. He notes that the court, in so finding, pointed to the fact that

his support structure was in place at the time of the robbery. Coleman contends his motion proposed additional conditions and measures beyond the support structure already in place at the time he was charged with the new crime. He presented a detailed "strong release plan" that would "double down on structuring [his] days." Family and PBMR personnel would "hold him accountable every single day to be where he was supposed to be." Along with a curfew and electronic monitoring, Coleman would present "a very low risk of recidivism" under his proposed release plan. According to Coleman, GPS location monitoring would provide a strong deterrent to commit robberies "not by ensuring police could respond *before or during* a robbery, but by making it clear to Coleman that they would be able to conclusively prove he performed them after the fact." (Emphasis in original). Thus, the "easy targets" that concerned the court would not exist. Coleman further argues that the State's proffer showed Coleman to be "a person who had not seriously considered the possibility of getting caught." A GPS monitor, however, would be a "constant reminder" that police know where he is and consequences will follow if he commits a crime.

¶ 22    Coleman relies on the fact that he put forth a release plan as an available alternative to detention. But merely suggesting an alternative to detention does not necessarily mean that alternative is sufficient to mitigate a defendant's safety threat. Nor does the mere possibility of an alternative make the court's decision to order detention error. Although the proposed release plan may be more stringent than the conditions Coleman was under when the robbery occurred, the trial court could reasonably find that even more stringent conditions were still insufficient to mitigate the threat he poses. Thus, we are unpersuaded that the trial court's finding was against the manifest weight of the evidence.

¶ 23        Additionally, the trial court did not solely rely on the fact that the same support structure was in place when the robbery occurred in finding less restrictive conditions could not mitigate the safety threat Coleman poses. It also noted the nature and circumstances of the robbery, Coleman's criminal history, and that Coleman was a participant in the Program at the time. The PFA instructs trial judges to take these factors into account. See 725 ILCS 5/110-5(a)(1), (a)(3)(A), (a)(3)(B) (West 2022).

¶ 24        Last, Coleman's memorandum asserts he is "a person who had not seriously considered the possibility of getting caught" and a GPS monitor will remind him of consequences for committing a crime. Coleman did not make this exact argument before the trial court. Nonetheless, the court's remarks indicate that it believed his UUW case and placement in the Program were sufficient to impress upon Coleman that he could face consequences for committing new crimes. Thus, the court could reasonably find that the option to release Coleman with GPS monitoring would not mitigate the threat he poses. In addition, the fact that Coleman posted an image of himself holding evidence of the robbery with a caption referring to it on social media weighs against believing that the risk of "getting caught" is an adequate deterrent.

¶ 25        For these reasons, we affirm the judgment of the trial court denying Coleman's motion for pretrial release.

¶ 26        Affirmed.

¶ 27        JUSTICE OCASIO, dissenting:

¶ 28        The State accused Rondell Coleman of violating the terms of his First Time Weapon Offender Program (730 ILCS 5/5-6-3.6 (West2022)) by committing a robbery, and the trial court ordered him detained until it resolves that accusation. The majority reviews that decision to detain by the manifest weight of the evidence. For the reasons recently and persuasively articulated by

Justice David Ellis, I believe that, except for findings of historical fact, detention orders should be reviewed *de novo*. See *People v. Whitaker,* 2024 IL App (1st) 232009, ¶¶ 79-138 (Ellis, J. concurring). Under that standard, I would hold that the State had failed to carry its burden of proving by clear and convincing evidence that the tightly structured release plan proposed by Coleman, in combination with verification through GPS monitoring, was not adequate to mitigate any threat of safety that Coleman might present to the community. Accordingly, I respectfully dissent.