2025 IL App (1st) 231674-U

No. 1-23-1674

Order filed December 19, 2025

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 10482 |
| | ) | |
| RUEBEN RHODES, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice C.A. Walker and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's denial of defendant's motion to suppress evidence was proper where the police had probable cause to search defendant and his vehicle.

¶ 2    After a bench trial, Rueben Rhodes was convicted of possession of a controlled substance for possessing less than 15 grams of cocaine (720 ILCS 570/402(c) (West 2016)) and sentenced to three years' imprisonment. On appeal, Rhodes argues that the trial court erred in denying his motion to suppress evidence, contending the police lacked probable cause to search his car or his

person after encountering him in an alley while arresting another individual. We affirm, concluding that neither search violated the fourth amendment.

¶ 3                                    Background

¶ 4      Rhodes was charged with one count of armed violence, six counts of aggravated unlawful use of a weapon, and one count of possession of a controlled substance. The circumstances of his arrest led to the murder charge in a separate case (No. 17-CR-10560). Although the State considered joining the cases, it ultimately proceeded separately.

¶ 5      Rhodes and his codefendant, Avior Thurman, filed similar suppression motions in both cases. Rhodes's motions to suppress evidence asserted that the police stopped, searched, and arrested him on June 15, 2017, without a warrant, consent, or probable cause. He alleged that he was not engaged in any unlawful conduct and that the search and seizure of suspected cocaine and a firearm violated his reasonable expectation of privacy. The trial court conducted a joint hearing on the motions.

¶ 6                    *Hearing on Motion to Suppress Evidence*

¶ 7      Chicago police detective Brian Collins testified that he was assigned to investigate a May 28, 2017, shooting that killed one person and wounded another. On June 8, 2017, Thurman became a suspect in the murder after a witness identified him in a photo array. Police did not obtain an arrest warrant, but had a "parole warrant" for Thurman, and Detective Roger Sandoval issued an investigative alert to arrest him for murder.

¶ 8      A few days later, police received information that Thurman would be near 4400 West Roosevelt Road. Officers conducted surveillance and saw Thurman standing in an alley outside a tire shop, where they arrested him without incident.

¶ 9 Collins testified that the purpose of the surveillance was to locate Thurman "and any of his associates." The police did not expect to find Rhodes, although he was a known associate of Thurman. Rhodes was a subject of the murder investigation after witnesses identified the car used in the shooting, and records showed it belonged to Rhodes. Collins obtained Rhodes's photograph and criminal history.

¶ 10 When Collins arrived in the alley, he saw a gold Kia parked about 20 to 30 feet from where police had detained Thurman. Rhodes was seated in the driver's seat, facing west and looking toward the approaching, unmarked police car.

¶ 11 As Collins and other officers neared, Collins saw Rhodes reach into the backseat, retrieve a white cloth, and make movements consistent with manipulating or concealing an object. Rhodes leaned toward the front passenger's area and got out as Collins and other officers exited their car.

¶ 12 Collins saw Rhodes had a lighter in one hand and cupped the other as if holding an object. As Collins approached, it appeared Rhodes dropped something. Collins testified that he recognized Rhodes from the photograph, "I then realized it was Ruben Rhodes, who is the owner of the vehicle that was the – was involved in the shooting, and I went to detain him." Collins knew Rhodes could see the officers approaching him and had just seen Thurman's arrest. Based on that and Rhodes's movements inside the Kia, Collins believed Rhodes was armed and dangerous and may have discarded a weapon inside the Kia. Suddenly, Rhodes attempted to flee, but police apprehended him after he went only 10 to 15 feet. A search of his person revealed 26 bags of suspect crack cocaine in his pocket.

¶ 13 With Rhodes detained, Collins returned to the Kia. He did not have a warrant; nonetheless, Collins had "reasonable articulable suspicion" that evidence of a crime or a weapon would be

found inside and that Rhodes was potentially armed with a dangerous weapon. He based his belief on Rhodes's movements, proximity to Thurman, and ownership of the car implicated in the murder.

¶ 14    Collins opened the Kia's driver's door, looked inside, and saw a white object on the other side. At the same time, Officer Guadalupe Sanchez retrieved the white object from the front passenger floorboard. Wrapped inside a white shirt was a loaded black semiautomatic handgun with an extended magazine and a live round in the chamber.

¶ 15    Police arrested Rhodes for possession of suspect cocaine, a firearm, and for obstruction. Rhodes was later identified by an eyewitness as the driver of the car involved in the murder.

¶ 16    The parties stipulated that body-worn camera footage from Detectives Collins and Sanchez accurately depicted the events. The video showed Rhodes leaving the Kia, raising his hands, fleeing as officers approached, and the subsequent search of the Kia and recovery of the firearm wrapped in a white shirt.

¶ 17    Rhodes stipulated that no investigative alert had been issued for him and rested.

¶ 18    The State moved for a directed finding, arguing that before searching the Kia, the police had reasonable suspicion to stop Rhodes, and when he ran, to charge him with obstruction.

¶ 19    In response, defense counsel argued that Rhodes's proximity to Thurman and ownership of the Kia used weeks earlier in a murder did not establish probable cause. He argued that the search was not incident to an arrest because Rhodes was arrested and handcuffed away from the Kia. Counsel conceded, however, that Rhodes's flight justified a *Terry* stop and the weapons frisk but that the search of his pockets and the Kia exceeded constitutional limits. Counsel noted that the officers did not announce themselves and were dressed in plain clothes when detaining Rhodes.

As for obstruction, none of the police officers identified themselves or stated that Rhodes was under arrest. Counsel sought suppression of the cocaine, firearm, and photograph taken after Rhodes's arrest.

¶ 20   The trial court concluded that Rhodes set forth a sufficient basis to proceed with his motion to suppress and denied the State's motion.

¶ 21   Defense counsel argued that Rhodes's furtive movements did not justify a search of his car or person because the police did not have probable cause. Rhodes was not seen committing a crime, and Thurman being nearby did not make Rhodes guilty by association. Counsel again asserted that Rhodes's act of fleeing justified a *Terry* stop and weapons frisk, but nothing more. Concerning Rhodes owning a car that may have been involved in a murder, he contended that it was not significant, as the police had known about Rhodes but hadn't gone to his home to question him.

¶ 22   The State responded that Collins knew he had reasonable suspicion based on the Kia having been used in the murder, knowing Thurman was in Rhodes's car on the day of the murder, and seeing Rhodes and Thurman within 25 feet of each other in the alley. The State also argued Collins saw Rhodes making furtive movements with the cloth, which justified a *Terry* stop. When Rhodes ran, it gave Collins probable cause to arrest him for obstruction. The State described the situation as "an evolving set of circumstances" and that Collins was in a "unique position" because he already had information about Rhodes.

¶ 23   Defense counsel replied that the police had a right to frisk Rhodes but not to search him. If the recovery of the cocaine was unlawful, so too was the search of the car. Counsel maintained the police lacked probable cause to search Rhodes's person and car.

¶ 24    The trial court denied Rhodes's motion to suppress evidence. The court said that while furtive movements alone do not justify a search, "the sum of all the pieces" amounted to probable cause. The court noted that, in addition to the furtive movements, Rhodes owned a car involved in a murder, Collins recognized Rhodes as the owner, and Rhodes was in the same location as the suspected shooter. The trial court concluded that, together these facts constituted reasonable suspicion to stop Rhodes, which became probable cause when Rhodes tried to flee.

¶ 25    Concerning the contraband found on Rhodes, the trial court said that the police "certainly could have searched the car for any drugs, instead they found a weapon inside the car." And it was "a very fluid situation where the police didn't have everything until that moment in time." The court said it made "no sense" to require a warrant when Rhodes was present "right then and there." The trial court held that the police did not violate Rhodes's fourth amendment rights.

¶ 26                                          *Trial*

¶ 27    In November 2022, Rhodes and Thurman were tried in simultaneous but separate jury trials on charges of first degree murder and aggravated battery. The jury in Rhodes's case deadlocked, and the trial court declared a mistrial. The State, thereafter, proceeded to trial on the charges stemming from the June 15, 2017, arrest, including armed violence, aggravated unlawful use of a weapon, and possession of cocaine.

¶ 28    At the bench trial, Officer Sanchez testified consistently with Collins's testimony at the suppression hearing. Sanchez assisted Collins in searching the Kia, which was parked 20 feet from where Rhodes was detained. Sanchez opened the rear driver's side door, walked to the passenger side, opened the front passenger door, and recovered a loaded firearm with an extended magazine wrapped in a white T-shirt on the floorboard. Sanchez did not see Rhodes get out of the Kia or see

who placed the firearm on the floorboard. The State played the same video from Sanchez's body camera admitted at the suppression hearing.

¶ 29    Chicago police officer Vincent Ryan testified that he arrived in the alley with Sanchez and approached Thurman. Ryan observed other officers chasing Rhodes, who ran toward him before being handcuffed. Before placing Rhodes in a police car, Ryan searched him and recovered from his pocket a clear plastic bag containing 26 smaller purple bags, each containing a white rock-like substance Ryan suspected was crack cocaine.

¶ 30    The State played the video from Ryan's body-worn camera. It showed Ryan approaching Thurman, standing against a wall, then suddenly running toward Rhodes as other officers detain Rhodes on the ground. Rhodes confirms he owns the Kia and denies that the firearm recovered is his. Ryan asks why he ran. Rhodes replies that he thought it was a "hit." Although the video does not depict Ryan conducting a search, it shows Ryan holding items that he testified were the recovered narcotics. Ryan is also seen handling cash and returning it to Rhodes's pocket.

¶ 31    The parties stipulated that (i) Chicago police officer David Jeffrey would testify that the video from his body camera accurately depicted the events, including his arrival in the alley with Collins, seeing Thurman standing against a wall, and seeing Rhodes run eastbound as he approached; (ii) forensic chemist Moses Boyd tested 10 of the 26 recovered bags and determined they contained 1.1 grams of cocaine, with the total weight of all 26 bags at 2.9 grams; and (iii) Rhodes did not possess a valid FOID card or concealed carry license on the date of his arrest.

¶ 32    The trial court found that the State failed to prove Rhodes had constructive possession of the firearm and held he was not guilty of armed violence and aggravated unlawful use of a weapon.

But the court found Rhodes guilty of possession of a controlled substance based on the cocaine recovered from his pocket.

¶ 33    In his written posttrial motion, Rhodes argued that the State failed to prove him guilty beyond a reasonable doubt of possession of cocaine and that the trial court erred in denying his motion to suppress the cocaine because the "police did not have a warrant or probable cause to arrest." Rhodes acknowledged that he ran a "short distance" as police approached. He asserted that he was arrested because of his close proximity to Thurman. Rhodes's posttrial motion did not challenge the search of the Kia.

¶ 34    At the hearing on the posttrial motion, defense counsel argued that police lacked a warrant, investigative alert, or probable cause to believe Rhodes was involved in the murder. Therefore, police did not have probable cause to arrest or search him.

¶ 35    The State responded that the suppression evidence established that Rhodes was a person of interest in the murder based on his ownership of the car used in the shooting and that his flight on encountering police supported his arrest.

¶ 36    After the trial court denied the posttrial motion and reaffirmed its denial of the motion to suppress, it sentenced Rhodes to three years' imprisonment with credit for 2,275 days served.

¶ 37                                    Analysis

¶ 38    On appeal, Rhodes contends the trial court erred by denying his motion to suppress because the police did not have probable cause to search his Kia and person after encountering him in the alley while arresting Thurman. Rhodes concedes that officers had reasonable suspicion to conduct a *Terry* stop, but argues that they unlawfully searched the Kia before developing probable cause to arrest him. He further alleges that his brief flight of "a step or two" did not elevate reasonable

suspicion to probable cause. Alternatively, even if his flight was relevant, police lacked any information or evidence linking him or the Kia to the shooting.

¶ 39    Rhodes also argues that the trial court relied on an inaccurate factual recollection, asserting that the court justified the search of the Kia based on cocaine recovered from his person, even though the Kia search preceded the discovery of the cocaine. Furthermore, the cocaine should have been suppressed as fruit of the poisonous tree as the search of his person was due to the unlawful search of the Kia. Rhodes asks that his conviction be vacated.

¶ 40    The State responds that the totality of the circumstances, including his (i) flight, (ii) ownership of the Kia used in the murder, (iii) status as a person of interest in the murder investigation, (iv) furtive movements inside the Kia, and (v) close proximity to Thurman, provided probable cause to arrest Rhodes and to search the Kia for a weapon. The State maintains that the search of Rhodes's person was lawful as a search incident to an arrest.

¶ 41    A ruling on a motion to suppress presents mixed questions of both fact and law. *People v. Manzo*, 2018 IL 122761, ¶ 25. We defer to the trial court 's factual findings unless they are against the manifest weight of the evidence. *People v. Lozano*, 2023 IL 128609, ¶ 29. "Against the manifest weight of the evidence" requires the opposite conclusion to be apparent, or the findings are arbitrary, unreasonable, or not based on the evidence. *People v. Aljohani*, 2021 IL App (1st) 190692, ¶ 37, *aff'd*, 2022 IL 127037. We review the trial court's ultimate legal ruling *de novo*. *Lozano*, 2023 IL 128609, ¶ 29.

¶ 42    At a suppression hearing, the trial court assesses witness credibility, weighs the evidence, and draws reasonable inferences. *People v. Ceja*, 204 Ill. 2d 332, 347 (2003). On review, we consider both the suppression hearing and trial evidence. *People v. Eubanks*, 2019 IL 123525, ¶ 61.

This court "may affirm the trial court's ruling on a suppression motion 'on any basis appearing in the record, whether the trial court relied on that basis or its reasoning was correct.' " *Aljohani*, 2021 IL App (1st) 190692, ¶ 38 (quoting *People v. Daniel*, 2013 IL App (1st) 111876, ¶ 37).

¶ 43     The fourth amendment of the United States Constitution and article I, section 6 of the Illinois Constitution protect against unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Reasonableness is measured under an objective standard based on the totality of the circumstances. *People v. Moss*, 217 Ill. 2d 511, 518 (2005). Generally, a search and seizure requires a warrant supported by probable cause. *People v. Hill*, 2020 IL 124595, ¶ 20. The U.S. Supreme Court recognized an exception in *Terry v. Ohio*, 392 U.S. 1 (1968), allowing police officers to briefly stop suspicious individuals to make reasonable inquiries to confirm or dispel their suspicions of criminal activity. *People v. Johnson*, 237 Ill. 2d 81, 89 (2010). An officer must identify specific and articulable facts, which, together with natural inferences, reasonably justify the intrusion. *People v. Timmsen*, 2016 IL 118181, ¶ 9.

¶ 44     Probable cause to arrest exists when the facts known to police would lead a reasonably cautious person to believe a crime has been committed. *People v. Gocmen*, 2018 IL 122388, ¶ 33. Probable cause requires only a probability of criminal activity, not proof beyond a reasonable doubt, or a showing that a belief is either correct or more likely true than false. *Hill*, 2020 IL 124595, ¶ 24. When determining whether probable cause exists, officers may draw on their law-enforcement training and experience in make this assessment. *Hill*, 2020 IL 124595, ¶ 23

¶ 45     Applying these principles, the record supports the trial court's conclusion that police had probable cause to search the Kia. Officers arrived in the alley during a murder investigation seeking Thurman "and any of his associates." Rhodes was a known associate and a subject of the

investigation because he owned the car identified as the vehicle from which Thurman exited before the shooting.

¶ 46     Rhodes was seated in a Kia, parked about 20 to 30 feet from Thurman's arrest. Collins saw Rhodes retrieve a white cloth from the backseat, make movements consistent with "manipulating something," lean over toward the front passenger area, and exit.

¶ 47     On recognizing Rhodes as the owner of the car implicated in the murder investigation, Collins attempted to detain him. Rhodes fled about 10 to 15 feet before being apprehended. Based on Rhodes's movements, proximity to Thurman, and connection to the murder investigation, Collins believed Rhodes was armed and had discarded a weapon inside the Kia.

¶ 48     While Rhodes was being detained and handcuffed, Collins quickly returned to the Kia, searched the immediate area. At the same time, Sanchez went to the front passenger area and recovered a loaded semiautomatic handgun wrapped in a white cloth. Collins testified that he believed the car contained evidence of a crime and posed a safety risk. The trial court credited this testimony, and its factual findings were not against the manifest weight of the evidence. See *Lozano*, 2023 IL 128609, ¶ 29.

¶ 49     We find, based on the totality of the circumstances, that the evidence supported the trial court's conclusion that the police had probable cause to immediately search the Kia without a warrant. See *Hill*, 2020 IL 124595, ¶ 21. Collins articulated specific facts for Collins to suspect Rhodes was armed with a dangerous weapon, which he discarded inside the Kia, and that it was "a very fluid situation" which obviated the police from having to obtain a warrant and return to the scene. We find the facts known to Collins supported his belief that there was a reasonable probability a firearm or evidence of a crime was inside the Kia. See *Id.* ¶ 24.

¶ 50    As for the cocaine, the record shows that Officer Ryan recovered the drugs from Rhodes's pocket after Rhodes had been arrested but before being placed inside the police car. Thus, Ryan recovered the cocaine during a proper search incident to a lawful custodial arrest, an exception to the fourth amendment's warrant requirement. See *People v. Cregan*, 2014 IL 113600, ¶¶ 25-28.

¶ 51    Regarding Rhodes's argument that the court's finding relied on an inaccurate recollection of the facts that, we find the court's comment about what the police "could" have done to be a vague reflection on possible actions the police could have taken rather than a factual misstatement.

¶ 52    Also, the court may have been responding to defense counsel's argument that if the recovery of the cocaine was not lawful, it did not justify the search of the Kia. The record shows the sequence of events, with the search of the Kia occurring before the search of Rhodes. Nothing indicates that the court misunderstood what had occurred. Even if the court's comment is seen as a misstatement, this court may affirm the trial court's ruling on any basis in the record, no matter the trial court's reasoning. *Aljohani*, 2021 IL App (1st) 190692, ¶ 38.

¶ 53    Accordingly, the trial court's denial of Rhodes's motion to suppress evidence was proper.

¶ 54    Affirmed.